677 A.2d 162

JOHN W. MACDOUGALL, PLAINTIFF–APPELLANT, v. JAMES M. WEICHERT, INDIVIDUALLY, WEICHERT CO., REALTORS, A NEW JERSEY CORPORATION, AND WALTER J. SHERMAN, INDIVIDUALLY, DEFENDANTS–RESPONDENTS, AND ROBERT MERRIAM, INDIVIDUALLY, DEFENDANT.

Argued March 14, 1995—Decided June 10, 1996.

382

*Steven K. Greene* argued the cause for appellant (*Bongiovanni, Collins & Warden*, attorneys; *John B. Collins*, of counsel).

*Jerrold J. Wohlgemuth* argued the cause for respondents (*Apruzzese, McDermott, Mastro & Murphy*, attorneys).

The opinion of the Court was delivered by

HANDLER, J.

In this case, plaintiff was engaged as a salesperson for a real estate firm. He was also an elected member of the local municipal governing council. As a member of the municipal council, he voted for a parking ordinance that was opposed by a client of the real estate firm. Plaintiff was subsequently discharged from his real estate sales position because the client threatened to terminate his business relationship with the realtor if it continued to retain plaintiff as a sales associate.

Plaintiff claimed that his termination by his employer, the real estate firm, constituted a wrongful discharge and that the client tortiously interfered with his prospective economic relations by instigating his termination. Those claims were dismissed on the basis of summary judgments.

Because the record presents unsettled issues of fact, we remand this case for a retrial. Accordingly, we undertake to explain the standards that should govern retrial of the matter.

The initial issue that must be considered on remand is whether the working relationship between a real estate salesperson and the realtor is one of employment that is covered by the wrongful discharge doctrine. If the relationship is one of employment, the court must then determine whether the termination of that relationship because the salesperson's vote to approve a municipal parking ban was contrary to the interests of the realtor's customer constitutes a wrongful discharge. The court must further determine whether the customer's conduct constituted a tortious interference with the salesperson's prospective economic relations.

I

Plaintiff John W. MacDougall was a sales associate for defendant Weichert Co., Realtors ("Weichert"). He began working for Weichert on March 5, 1984, at Weichert's Chester office. At the time, he was also an elected member of the Chester Borough Council ("the Council") and its President. Defendant Robert Merriam was a real estate developer who used Weichert to sell his properties. He also owned a two-story office building in Chester, which had several tenants.

In the Spring of 1987, the Council began considering an ordinance that would ban public parking in front of Merriam's office building. Merriam opposed the ordinance. Bernice Fisher, manager of Weichert's Mendham office, telephoned MacDougall before the vote on the parking ban. Fisher said she was calling on behalf of her friend Merriam and questioned MacDougall about the proposed ordinance. MacDougall did not know Merriam's relationship with Weichert, and Fisher did not indicate that Merriam had a substantial business relationship with Weichert. When MacDougall told Fisher that the parking ban had been recommended by the police department in response to complaints from local residents about overparking and would probably be enacted, Fisher replied: "Well, in that case, just forget this call," and hung up.

MacDougall voted in favor of the parking ban, which was passed on a split vote by the Council. Residents, however, complained almost immediately that the ordinance merely created parking problems further down the street. Their complaints prompted the Council to consider extending the parking ban to the entire street and to explore the possibility of providing an alternate parking location for the tenants of Merriam's building. To assist the Council, MacDougall went to Merriam's property to photograph the cars parked there. When Merriam saw MacDougall, he ordered MacDougall off his property. Two days later, Merriam had a sign painted on the side of his building that read: "To

Councilman MacDougall, No Trespassing, and that's carved in stone."

Within a week after the initial vote, Charles Schultz, manager of Weichert's Chester office, said to MacDougall: "I have a party very disturbed about the no parking ordinance." MacDougall did not recall whether Schultz mentioned Merriam by name at that meeting. MacDougall told Schultz that he could not change his vote. Schultz replied: "Well, so be it."

Shortly thereafter, defendant Walter J. Sherman, Weichert's regional vice president, handed MacDougall a letter formally terminating him. The letter said:

Robert Mirriam [sic], the owner of a professional building in Chester, has involved us in his ongoing problem with the town in reference to his parking situation.

As you may know, Bob is a long time builder who has worked with our company for a number of years in the Somerset, Hunterdon, and Morris Counties.

Bob has advised us he can no longer do business with us due to your involvement with the council and our company as an Independent Contractor.

Regretfully, this dispute could have a substantial economic impact upon the company. In order to extract Weichert, Realtors from any involvement in this dispute, we deem it necessary to terminate your relationship with our company as an Independent Contractor effective immediately.

Please advise us where we can transfer your license.

Respectfully,

s/Walter J. Sherman

Regional Vice President

MacDougall filed a complaint, alleging essentially that (1) Weichert, James M. Weichert (President of Weichert), and Walter J. Sherman (collectively, "Weichert defendants") violated a clear mandate of public policy by terminating him in retaliation for his vote on the parking ordinance; (2) Merriam tortiously interfered with his relationship with Weichert by causing his termination; and (3) Merriam libeled him. Defendants moved for summary judgment. The trial court granted summary judgments, dismissing the claims relating to both wrongful discharge and tortious interference. By stipulation, the trial court dismissed the libel count with prejudice. The Appellate Division affirmed the trial

court's decision.  We granted plaintiff's petition for certification. 139 *N.J.* 183, 652 *A.*2d 172 (1994).

## II

The initial question in this case is whether MacDougall was an employee of Weichert for purposes of raising a wrongful discharge claim under *Pierce v. Ortho Pharmaceutical Corp.*, 84 *N.J.* 58, 417 *A.*2d 505 (1980).  That question was resolved by the trial court by summary judgment.  The court found that MacDougall was an independent contractor and therefore not protected under the wrongful discharge doctrine.  On appeal, the Appellate Division considered and affirmed the trial court's grant of summary judgment on that ground.

The wrongful discharge doctrine is grounded in public policy and is designed to protect employees when failing to do so would violate a clear mandate of public policy.  *Id.* at 72, 417 *A.*2d 505.  It does not protect independent contractors.  The doctrine grew out of a need to protect at-will employees, who are under the total control of the employer and without separate or independent contractual rights that provide employment protections.  *Id.* at 65–67, 417 *A.*2d 505.

An individual may be considered an employee for some purposes but an independent contractor for others.  "Whether or not a person is dubbed an employee can have many [legal] consequences. . . .  The answer to the employment question properly varies with the varying consequences of the determination, and the public policies engaged."  *Crowe v. M & M/Mars*, 242 *N.J.Super.* 592, 598, 577 *A.*2d 1278 (App.Div.), *certif. denied*, 122 *N.J.* 387, 585 *A.*2d 389 (1990).  The categorization of a working relationship depends not on the nominal label adopted by the parties, but rather on its salient features and the specific context in which the rights and duties that inhere in the relationship are ultimately determined.  *See Volb v. G.E. Capital Corp.*, 139 *N.J.*

110, 651 A.2d 1002 (1995) (determining status as special employee using relationship's salient features).

Many facts impelled the lower court to determine that MacDougall's relationship with Weichert was that of an independent contractor and hence did not constitute the kind of employment that is the basis for a tort claim based on wrongful discharge. MacDougall and Weichert signed an agreement that purported to make MacDougall an independent contractor. Weichert promised to provide real estate listings and office facilities and MacDougall was to be paid by commissions. Moreover, neither party was liable for the other's expenses. The contract also stated that there were no sales quotas or mandatory sales meetings. In addition, MacDougall was responsible for his own license, trade dues, and health insurance. Either side could terminate the contract at any time by written notice. The contract provided further:

> The Sales Associate acknowledges that he/she is not an employee nor a partner, but a Sales Associate with an independent contractor status, with no rights of [worker's] compensation, salary, pension, sick leave, sick pay, or other attributes of an employee relationship. The Sales Associate will not be treated as an employee with respect to the services performed by such salesperson as a real estate agent for federal tax purposes.

Finally, after the relationship ended, MacDougall could not use any remaining prospects, listings, or referrals.

Nevertheless, several facts suggest that Weichert exerted substantial control over MacDougall. MacDougall worked in an office maintained by Weichert, a Weichert manager supervised MacDougall's work, Weichert required MacDougall to take its training program, and Weichert shared the commission profits.

The critical issue is whether the elements of control and dependence coupled with the absence of any employment protection predominate over factors that favor an independent contractor status. Although in some respects that issue implicates an ultimate factual determination as well as a legal conclusion, there are material issues of subsidiary facts concerning the working relationship between the parties that are unresolved on this record.

Consequently, the matter was not amenable to summary judgment. *Brill v. Guardian Life Ins. Co. of Am.*, 142 *N.J.* 520, 666 *A.*2d 146 (1995). We note, in addition, that MacDougall did not present the issue of his employment status on appeal until he filed his reply brief, raising the possibility that the question of employment was not fully presented.

Therefore, we remand the case to the trial court to determine whether MacDougall was Weichert's employee for purposes of invoking a cause of action based on wrongful discharge.

### III

The trial court determined by summary judgment that even if MacDougall were an employee, he did not demonstrate that he was wrongfully discharged. The Appellate Division sustained that determination. If on the retrial of this matter, the trial court determines that the working relationship was one of employment, then it must consider whether plaintiff was wrongfully discharged. That issue, we note, has been fully briefed and argued on the appeal before us. Accordingly, we deem it appropriate to explain the standards that should inform and guide the trial court in the event it reaches the issue of wrongful discharge.

### A.

In *Pierce*, we recognized that "an employee has a cause of action for wrongful discharge when the discharge is contrary to a clear mandate of public policy." 84 *N.J.* at 72, 417 *A.*2d 505. We therefore modified the common law rule permitting employers and employees, in the absence of an employment contract, to terminate the employment relationship with or without cause. *Id.* at 65–66, 417 *A.*2d 505. We recognized the wrongful discharge cause of action only after balancing the interests of the employee, the employer, and the public. "Employers have an interest in knowing they can run their businesses as they see fit as long as their conduct is consistent with public policy." *Id.* at 71, 417 *A.*2d 505.

■ Out of respect for the employer's interest, employees can bring wrongful discharge claims only if they can identify an expression that equates with a clear mandate of public policy and if they can show that they were discharged in violation of that public policy. *Id.* at 72–73, 417 *A.*2d 505. Sources of public policy include the United States and New Jersey Constitutions; federal and state laws and administrative rules, regulations, and decisions; the common law and specific judicial decisions; and in certain cases, professional codes of ethics. *Hennessey v. Coastal Eagle Point Oil Co.*, 129 *N.J.* 81, 92–93, 94–95, 609 *A.*2d 11 (1992); *Pierce, supra*, 84 *N.J.* at 72, 417 *A.*2d 505.

■ A basic requirement of the wrongful discharge cause of action is that the mandate of public policy be clearly identified and firmly grounded. *See, e.g., Potter v. Village Bank*, 225 *N.J.Super.* 547, 558–60, 543 *A.*2d 80 (App.Div.) (holding that discharge of bank president for reporting suspected illegal money laundering by bank directors violated clear mandate of public policy; "few people would cooperate with law enforcement officials if the price they must pay is retaliatory discharge from employment."), *certif. denied*, 113 *N.J.* 352, 550 *A.*2d 462 (1988); *Cerracchio v. Alden Leeds, Inc.*, 223 *N.J.Super.* 435, 446, 538 *A.*2d 1292 (App.Div.1988) (holding that "under *Pierce*, an employee in New Jersey may maintain a private action in tort or contract for retaliatory discharge as a result of the filing of an OSHA complaint because such discharge contravenes our public policy"); *Kalman v. Grand Union Co.*, 183 *N.J.Super.* 153, 157–59, 443 *A.*2d 728 (App.Div. 1982) (holding that discharge of pharmacist for refusing to violate state administrative regulation requiring pharmacist to be present at all times pharmacy operates for business and for reporting his employer's intended violation pursuant to statutory provision and his professional code of ethics would violate clear mandate of public policy); *O'Sullivan v. Mallon*, 160 *N.J.Super.* 416, 418–19, 390 *A.*2d 149 (Law Div.1978) (holding that complaint alleging that plaintiff x-ray technician was fired for refusing to perform cathet-

erizations, which she could not legally perform, stated a cause of action).

■ A vague, controversial, unsettled, and otherwise problematic public policy does not constitute a clear mandate. Its alleged violation will not sustain a wrongful discharge cause of action. *See, e.g., Pierce, supra,* 84 *N.J.* at 76, 417 *A.*2d 505 ("As a matter of law, there is no public policy against conducting research on drugs that may be controversial, but potentially beneficial to mankind, particularly where continuation of the research is subject to approval by the FDA."); *DeVries v. McNeil Consumer Prods. Co.,* 250 *N.J.Super.* 159, 172, 593 *A.*2d 819 (App.Div.1991) (holding that discharge of employee for having distributed "expired" drugs at employer's direction did not violate clear mandate of public policy because the discharge "implicated only the private interests of the parties"); *Schwartz v. Leasametric, Inc.,* 224 *N.J.Super.* 21, 30, 539 *A.*2d 744 (App.Div.1988) (holding that discharge of employee to avoid paying commissions on future transactions did not violate clear mandate of public policy); *Giudice v. Drew Chem. Corp.,* 210 *N.J.Super.* 32, 36, 509 *A.*2d 200 (App.Div.) ("Private investigation of possible criminal activities of fellow employees does not implicate the same public policy consideration as if plaintiffs had been fired as a result of cooperating with law enforcement officials investigating possible criminal activities of fellow employees."), *certif. denied,* 104 *N.J.* 465, 517 *A.*2d 449 (1986); *Alexander v. Kay Finlay Jewelers, Inc.,* 208 *N.J.Super.* 503, 508, 506 *A.*2d 379 (App.Div.) (determining that discharge of employee who filed civil suit against employer to collect allegedly unpaid salary did not violate clear mandate of public policy because there is "no statutory or regulatory proscription against [the] firing"), *certif. denied,* 104 *N.J.* 466, 517 *A.*2d 449 (1986); *Warthen v. Toms River Community Memorial Hosp.,* 199 *N.J.Super.* 18, 28, 488 *A.*2d 229 (App.Div.) (ruling that discharge of nurse for refusing to administer kidney dialysis to terminally ill patient did not violate clear mandate of public policy where employee was

motivated by "her own personal morals"), *certif. denied,* 101 *N.J.* 255, 501 *A.*2d 926 (1985).

■ In most cases of wrongful discharge, the employee must show retaliation that directly relates to an employee's resistance to or disclosure of an employer's illicit conduct. *See, e.g., Lally v. Copygraphics,* 85 *N.J.* 668, 670–71, 428 *A.*2d 1317 (1981); *Potter v. Village Bank, supra,* 225 *N.J.Super.* at 558–60, 543 *A.*2d 80; *Cerracchio v. Alden Leeds, Inc., supra,* 223 *N.J.Super.* at 446, 538 *A.*2d 1292; *Kalman v. Grand Union Co., supra,* 183 *N.J.Super.* at 157–59, 443 *A.*2d 728; *O'Sullivan v. Mallon, supra,* 160 *N.J.Super.* at 418–19, 390 *A.*2d 149. In some cases, however, the employee may show that the retaliation is based on the employee's exercise of certain established rights, violating a clear mandate of public policy. *Hennessey, supra,* 129 *N.J.* at 91, 102–03, 106–07, 609 *A.*2d 11 (determining that discharge of employee for failing (or refusing to take) a random test for illegal drug use implicates a clear mandate of public policy protecting individual privacy rights, but holding that discharge was lawful where employee served in a safety-sensitive position); *Velantzas v. Colgate–Palmolive Co.,* 109 *N.J.* 189, 192, 536 *A.*2d 237 (1988) (per curiam) (holding that employee demanding her personnel file stated cause of action under the Law Against Discrimination, *N.J.S.A.* 10:5, by alleging that "she was discharged for seeking to establish a gender discrimination claim"); *Lally v. Copygraphics, supra,* 85 *N.J.* at 670–71, 428 *A.*2d 1317.

### B.

■ MacDougall has a cause of action for wrongful discharge if the discharge was contrary to a clear mandate of public policy. *Pierce, supra,* 84 *N.J.* at 72, 417 *A.*2d 505. He essentially contends that his vote as a councilman on legislative matters that were before the local governing body is an official action that cannot be subjected to retaliation by his employer. MacDougall argues that the clear mandate of public policy that was violated by his termination is derived from two particular statutes: *N.J.S.A.*

2C:27–3 and 27–5. We therefore first consider whether these enactments and their underlying policy reflect a clear mandate of public policy that prohibits the discharge of MacDougall for his official actions as an elected representative.

MacDougall stresses primarily the first section of *N.J.S.A.* 2C:27–3, *viz:*

> a. Offenses defined. A person commits an offense if he directly or indirectly:
>
> (1) Threatens *unlawful harm* to any person with purpose to influence a decision, opinion, recommendation, vote, or exercise of discretion of a public servant, party official or voter on any public issue or in any public election[ ]

> \* \* \* \* \* \* \* \*

> [*Ibid.* (emphasis added).]

MacDougall asserts that *N.J.S.A.* 2C:27–5 is also a source for the clear mandate of public policy. That statute provides:

> A person commits a crime of the fourth degree if he *harms another by any unlawful act* with purpose to retaliate for or on account of the service of another as a public servant.

> [*Ibid.* (emphasis added).]

Whether these statutes and their underlying policy express a clear mandate of public policy applicable to MacDougall's employment requires foremost an understanding of the terms of the statutes, more specifically, the meaning of "unlawful harm." It is significant that the statutes themselves differentiate between public officials holding legislative office and those holding non-legislative offices. That difference relates to the kind of harm that may be directed against a public official. The threat of "harm" that *N.J.S.A.* 2C:27–3a(1) proscribes is "unlawful harm." If, however, the public servant holds a judicial or administrative office, *N.J.S.A.* 2C:27–3a(2), (3) proscribes the threat of any harm, not just the threat of "unlawful harm." Thus, paragraphs (2) and (3) broaden the proscription to the threat of any "harm" but limit its application to only non-legislative officials. Under these provisions, a person commits an offense if he or she:

(2) Threatens *harm* to any public servant with purpose to influence a decision, opinion, recommendation, vote or exercise of discretion in a *judicial* or *administrative* proceeding; or

(3) Threatens *harm* to any public servant or party official with purpose to influence him to violate his official duty.

[*N.J.S.A.* 2C:27–3(a)(2), (3) (emphases added).]

The history of *N.J.S.A.* 2C:27–3 sheds light on the distinction between harm that is unlawful and harm that is not unlawful, and elucidates the meaning of "unlawful harm." The source of our statute is the *Model Penal Code* ("MPC"). That history is highly relevant in determining the legislative intent underlying our parallel enactments. *State v. Sewell,* 127 *N.J.* 133, 143, 603 *A.*2d 21 (1992) (noting that where the Legislature has seen fit to adopt a portion of the MPC substantially unaltered, borrowed language should be interpreted in accordance with the meaning intended by the drafters of the MPC); *State v. Butler,* 89 *N.J.* 220, 227, 445 *A.*2d 399 (1982); *see also State v. Haliski,* 140 *N.J.* 1, 31, 656 *A.*2d 1246 (1995) (Stein, J., dissenting) (same).

Subparagraphs 240.2(1)(a) through (c) of the MPC are almost identical to *N.J.S.A.* 2C:27–3a(1) through (3).[1] Like our statute, the first subparagraph of the MPC provision prohibits only threats of "unlawful harm," while the next two subparagraphs prohibit the threat of any "harm." The presence of this distinction in the Final Draft of the MPC reflects a careful decision by the members

---

[1] The Model Penal Code provision reads:

§ 240.2 Threats and Other Improper Influence in Official and political Matters.

(1) *Offenses Defined.* A person commits an offense if he:

(a) threatens unlawful harm to any person with purpose to influence his decision, opinion, recommendation, voter or other exercise of discretion as a public servant, party official or voter; or

(b) threatens harm to any public servant with purpose to influence his decision, opinion, recommendation, vote, or other exercise of discretion in a judicial or administrative proceeding; or

(c) threatens harm to any public servant or party official with purpose to influence him to violate his known legal duty; or

. . . .

of the American Law Institute to accommodate concerns in the provision's tentative drafts.

Commentary to one of the tentative drafts focuses on the distinction between permitted and impermissible threats. Section 240.2 is a composite of two provisions contained in MPC Tentative Draft Number 8, Section 208:11 ("Intimidation in Official and Political Matters") and Section 208:14 ("Corrupt Influence in Official Proceedings"). The official commentary to Section 208:11 advises that "[t]he principal [drafting] difficulty is drawing the line between permissible and prohibited threats." It proceeds to explain that:

[f]or example, threats of political opposition are legitimate means of influencing political decisions. A political official's threat to discharge a subordinate, if he pursues a particular course of official behavior, may be reprehensible interference or legitimate supervision. It would be intolerable to subject such threats to review by way of criminal prosecution. . . .

One way of solving the problem would be to restrict the section to threats to do "unlawful" acts. That would include, for example, threat of physical injury to the person, threat of property harm forbidden by the law of torts, and threat to discharge a public servant in violation of an applicable civil service code. Even if the threatened harm would be a civil wrong ordinarily, it would be appropriate to invoke the criminal law against the use of such threats to coerce official or political action.

\*      \*      \*      \*      \*      \*      \*      \*

[Model Penal Code § 208.11, cmt. at 108 (Tentative Draft No. 8 1958) ]

In addition, the history of *N.J.S.A.* 2C:27–3 and –5 discusses how to define what threats are impermissible. Those provisions both employ identical language in their characterization of harm as "unlawful" and share a common history. *N.J.S.A.* 2C:27–5 is modelled after § 240.4 of the MPC, which also uses the language "harms another by any unlawful act." The final MPC provision is identical to its Tentative Draft version, § 208.13. The Commentary to § 208.13 explains that "[t]here is here a problem of defining the kinds of retaliatory acts [that] should be covered, similar to the problem of defining forbidden threats under Section 208:11. Retaliation is limited to unlawful acts." Model Penal Code § 208.13 cmt. at 110 (Tentative Draft No. 8 1958).

We note, further, that under the statute the harm threatened against a public servant who occupies a judicial or administrative office need not be "unlawful" to constitute a violation. See *supra* at 395, 677 *A.*2d at 169 (quoting *N.J.S.A.* 2C:27–3(a)(2)). The same distinction is recognized in the parallel provision of the MPC, *viz:*

> (b) threatens harm to any public servant with purpose to influence his decision, opinion, recommendation, vote, or other exercise of discretion in a judicial or administrative proceeding.
>
> [*MPC* § 240.2(1)(b).]

That distinction is important as a matter of public policy because MacDougall's official action that allegedly triggered his retaliatory discharge—his vote for the parking ban—was undertaken in a legislative proceeding, not a judicial or administrative one. The underlying public policy that differentiates between legislative office holders and those occupying judicial or administrative office tolerates a wider range of conduct intended to influence legislators as opposed to conduct directed toward public officials exercising judicial or administrative authority. The commentary to proposed MPC section 208.14 observes that there is a "universal concern to protect *judicial* proceedings from improper influence." Model Penal Code § 208.14, cmt. at 111 (Tentative Draft No. 8 1958). In addition, it argues that in light of the important quasi-judicial roles now undertaken in administrative proceedings, administrative officials should be included in the ambit of the special protections afforded to the judiciary.

Significantly, in considering what kind of harm would be unlawful when directed against a legislative representative, the Institute expressly contemplated that employers would be free to "attempt[ ] to influence an employee's decision as a legislator ... by threat[ening] to terminate the employment." Model Penal Code cmt. § 208.11, page 108 (Tentative Draft No. 8 1958).[2]

---

[2] The distinction between legislative office and judicial and executive or administrative office is illustrated in *Smith v. Farmers Coop. Ass'n*, 825 P.2d 1323 (Okla.1992). The plaintiff was the mayor of Butler, Oklahoma, and a voting

■ Based on the legislation's extensive history and its statutory language and structure, we determine that to "threaten[ ] unlawful harm" or to "harm[ ] another by an unlawful act" means to threaten or inflict a harm that is unlawful as a crime, tort, or violation of a law, administrative regulation, or other legal duty. That statutory understanding expresses a clear mandate of public policy that serves to protect public officials holding legislative office in the exercise of official duties relating to legislative matters. We conclude further that because the clear mandate of public policy derived from these statutes to protect public employees is the basis for a civil action for wrongful discharge, rather than a criminal charge, in analyzing the wrongful discharge claim, that public policy is broader in scope and application than the statutes themselves. Consequently, unlawful harm under that public policy may include actions that violate recognized and accepted standards of conduct, such as applicable codes of ethics.

---

member of the town board of trustees, which reformed legislative duties in passing proposals and quasi-administrative duties in reviewing zoning cases. He also was an at-will employee of the defendant cooperative association. Smith claimed that a member of the cooperative's board of directors spoke to him about obtaining a zoning variance. Smith was fired after he voted against the variance, which was rejected by the board of trustees. Although he alleged no specific threats, he claimed that he was fired in retaliation for his vote. The Oklahoma Supreme Court decided that Smith had an actionable claim based on the alleged retaliation.

> Section 43–101 provides that the general zoning power of municipalities is "[f]or the purpose of promoting health, safety, morals, or the general welfare of the community." An official who derives his authority from section 43–101 is required to act in the public's best interest. The public policy exception to the employee-at-will doctrine applies when an employee is fired in retaliation for acting consistent with section 43–101.... [I]f Smith were fired for performing an act consistent with public policy such as administering the town's zoning laws while acting in his capacity as mayor and a voting member of the town's board of trustees, he would have an actionable tort claim.

[*Id.*, 825 *P.*2d at 1326.]

It is clear that Smith was acting in the capacity of an administrative or executive official under the quasi-administrative duty to enforce a specific body of regulatory laws, in contrast to MacDougall's official actions as a legislator.

The critical question in this case is whether under all of the surrounding circumstances MacDougall's termination by Weichert violated that clear mandate of public policy and was in retaliation for either his vote on the municipal parking ban ordinance or his refusal to change the ordinance.

At the outset, we recognize that conduct that is directed against constitutionally-protected activity may violate a clear mandate of public policy, even though it may not offend any other statutory or legal standard. *Supra* at 390, 393, 677 *A*.2d at 167, 168. *Compare Shovelin v. Central New Mexico Elec. Coop., Inc.,* 115 *N.M.* 293, 850 *P*.2d 996 (1993) (holding that employee's retaliatory discharge based on employee's election to public office did not violate public policy) *with Novosel v. Nationwide Ins. Co.,* 721 *F*.2d 894, 898–900 (3d Cir.1983) (holding that termination of an employee for refusing employee's request to engage in political lobbying activities violates clear mandate of public policy under Pennsylvania law). In this case, MacDougall does not claim that his exercise of first amendment rights prompted his discharge nor that his official actions as a councilman were constitutionally protected.

We recognize that the harm directed against an employee who holds a legislative office need not be criminal in order to be regarded as unlawful and in violation of the clear mandate of public policy. The dissent of the Chief Justice similarly stresses that the harm inflicted on a public official need not be criminal to violate either the underlying statutes or the clear mandate of public policy that they express. The dissent argues, however, that the harm entailed in firing an employee for exercising his vote as an elected representative violates the clear mandate of public policy against the infliction of harm because such retaliatory action is the "equivalent" of a "bribe" or "corrupt fix." *Post* at 413–414, 677 *A*.2d at 178–179.

If retaliatory conduct against a public officer approximates bribery or comparable corruption, it would be an egregious harm that violates the clear mandate of public policy that is rooted

in *N.J.S.A.* 2C:27–3 and –5, even if it does not meet the statutory definition of bribery. We are unable to conclude, however, that either the threat of the loss of employment or retaliation through the actual loss of employment was understood by the Legislature as a "bribe," or its equivalent. The Institute considered those specific kinds of harms—the threat of the loss or the actual loss of employment—and determined them not to be the kind of unlawful harm that triggers the prohibitions of the statute. Thus, in considering the statutory prohibition, the Institute observed:

> However, restricting Section 208.11 to "unlawful" acts would leave obvious gaps in coverage. The section would then not reach a defendant who attempted to influence a judge, legislator, or administrator by threatening to foreclose a mortgage, or to inform the district attorney of a law violation, or to publicize a scandal in a public official's private life, or to withhold business patronage. *Nor would it cover a private employer who attempts to influence an employee's decision as a legislator, juror, or voter, by threat to terminate the employment.*
>
> [Model Penal Code § 208.11, cmt. at 108 (Tentative Draft No. 8 1958) (emphasis added).]

This comment reflects an understanding that employers must have reasonable flexibility in conducting their businesses and should be free to disassociate themselves from controversial political positions that their employees may take. Many local issues create such heated controversy that certain political views could hurt the employer's rapport with its clients and customers. It would be unfair to categorize acting on those business concerns as bribery or corruption. Thus, absent aggravating circumstances that would elevate a threatened or retaliatory firing to the level of bribery or corruption, such action, not otherwise contrary of any law or legal duty, does not violate a clear mandate of public policy.

The unlawful harm that violates the clear mandate of public policy derived from *N.J.S.A.* 2C:27–3 and –5 may consist of tortious conduct or conduct that violates a civil or legal duty. *Supra* at 397, 677 *A.*2d at 170. Such unlawful harm may also include conduct that violates an applicable code of ethics. *Supra* at 391, 677 *A.*2d at 167. We have noted that wrongful discharge frequently involves retaliation based on the employee's opposition to the employer's unlawful or unethical conduct. *Supra* at 393,

677 *A.*2d at 168. The Legislature itself has expressly recognized in other contexts that retaliation against an employee need not be predicated on a clear or actual violation of law by the employer. Retaliation against an employee who acts only on a reasonable belief that the employer has violated a law or regulation or a clear mandate of public policy can constitute a wrongful discharge. *See, e.g.,* The Conscientious Employee Protection Act, *N.J.S.A.* 34:19–3 (protecting workers who based on reasonable belief disclose or object to violations of "a law, or a rule or regulation promulgated pursuant to law."); *Barratt v. Cushman & Wakefield, Inc.,* 144 *N.J.* 120, 675 *A.*2d 1094 (1996); *Abbamont v. Piscataway Township Bd. of Educ.,* 138 *N.J.* 405, 650 *A.*2d 958 (1994).

The clear mandate of public policy derived from *N.J.S.A.* 2C:27–3 and –5 affords protections for public employees that go beyond criminal sanctions. As previously noted, the unlawful harm directed against a public official that is proscribed by these statutes can be based on civil wrongs and need not be criminal in nature. Here, because MacDougall was a public official, and because *N.J.S.A.* 2C:27–3 and –5 and the public policy derived therefrom deal with public officials, the determination of whether harmful acts directed against such public officials violate the clear mandate of public policy should be informed by the laws that govern the conduct of persons in public office.

The Local Government Ethics Law (*N.J.S.A.* 40A:9–22.1 to –22.25) requires municipalities to establish municipal ethics boards under codes of ethics that must be at least as restrictive as provisions set forth in *N.J.S.A.* 40A:9–22.5. *N.J.S.A.* 40A:9–22.21. Those provisions mandate that "No local government officer or employee shall act in his official capacity in any matter where he, a member of his immediate family, or a business organization in which he has an interest, has a direct or indirect financial or personal involvement that might reasonably be expected to impair his objectivity or independence of judgment." *N.J.S.A.* 40A:9–22.5(d). This law demands that an officeholder discharge duties with undivided loyalty.

■ We conclude that the conflict-of-interest laws not only impose duties on public employees but they also constitute constraints on persons dealing with public employees. These laws give added substantive meaning and lend strength to the clear mandate of public policy that has its basic source in the laws that proscribe harmful conduct directed at public officials. *N.J.S.A.* 2C:27–3 and –5. That public policy affords protection to at-will employees who hold public office from threats or retaliation based on interests or relationships that would engender disqualifying conflicts under the laws governing conflicts of interests.

In this case, the conflict-of-interest laws necessarily direct the focus of the analysis on whether Weichert violated a clear mandate of public policy in discharging MacDougall. These laws are germane to this analysis because they demarcate types of interests that do not conflict with governmental responsibilities and pose no threat to the public interest. *See, e.g., Van Itallie v. Borough of Franklin Lakes,* 28 *N.J.* 258, 268, 146 *A.*2d 111 (1958) (determining that public action on zoning ordinance affecting employer of councilman's brother did not involve disqualifying conflict of interest). However, the analysis of whether a discharge is wrongful because it offends the principles that define prohibited conflicts of interest is extremely difficult in view of the factual and legal complexities that abound in the application of conflict-of-interest laws.[3] Ultimately, the court must determine whether Weichert's conduct resulting in MacDougall's discharge equates with the kind of conduct and is based on the kind of interests that would have created a disqualifying conflict of interest. *See Wyzy-*

---

[3] It is often difficult to identify and define the kind of conflict of interest that will disqualify a public official or invalidate official action. *Van Itallie v. Borough of Franklin Lakes,* 28 *N.J.* 258, 268, 146 *A.*2d 111 (1958) (noting that conflict of interest analysis regarding disqualification is necessarily factual and depends upon the circumstances of the particular case); *see Wyzykowski v. Rizas,* 132 *N.J.* 509, 525–26, 626 *A.*2d 406 (1993) (noting four categories of conflicts of interest, citing Michael A. Pane, Conflict of Interest: Sometimes a Confusing Maze, Part II, New Jersey Municipalities (Mar.1980) at 8–9). The general test is whether circumstances can reasonably be interpreted to show that they had the likely capacity to tempt the officials from their sworn public duties. *Wyzykowski, supra,* 132 *N.J.* at 523, 626 *A.*2d 406 (quoting *Van Itallie, supra,* 28 *N.J.* at 268, 146 *A.*2d 111).

*kowski v. Rizas*, 132 *N.J.* 509, 525, 626 *A*.2d 406 (1993) (noting that a disqualifying conflict can arise when officials have indirect pecuniary interests in the voting matter, such as when someone closely tied to the official, like an employer or family member, is directly affected financially by the vote); *Pyatt v. Mayor & Council*, 9 *N.J.* 548, 557, 89 *A*.2d 1 (1952) ("it is most doubtful that participation by a councilman in a municipal action of particular benefit to his employer can be proper in any case.").

## C.

In conclusion, we determine that *N.J.S.A.* 2C:27–3 and –5 are the source of a clear mandate of public policy that serves to protect an employee from the threat or infliction of unlawful harm that is intended to influence his or her official action as an elected legislative representative. That harm would be unlawful if it is a violation of criminal law, the commission of a tort, or the violation of a civil or legal duty or an applicable code of ethics, including a violation of the principles that define the conflict-of-interest laws that govern the official actions of persons holding public office.

The record in this case fairly poses the issue of whether Weichert's conduct in terminating plaintiff's employment was based on interests or relationships that would constitute an impermissible conflict of interest and may have offended the standards that govern conflicts interest, thereby violating a clear mandate of public policy.

## IV

Plaintiff raises a claim against Merriam for tortious interference with prospective economic interest. Plaintiff alleges that he would not have been discharged without Merriam's tortious interference, and that the discharge resulted in damages in the form of lost clients and earnings. The lower courts rejected this claim.

The tort of intentional interference with prospective economic relations proscribes inducing a third person not to "continue" a "prospective relation." *Restatement (Second) of Torts*,

§ 766B(a) (1979). This Court has set forth four requirements for maintaining an action for tortious interference. *Printing Mart–Morristown v. Sharp Elecs. Corp.*, 116 *N.J.* 739, 563 *A.*2d 31 (1989). First, the complaint "must allege facts that show some protectable right—a prospective economic or contractual relationship. Although the right need not equate with that found in an enforceable contract, there must be allegations of fact giving rise to some 'reasonable expectation of economic advantage.' " *Id.* at ·751, 563 *A.*2d 31 (citation omitted). Second, "the complaint must allege facts claiming that the interference was done intentionally and with 'malice.' ... [M]alice is defined to mean that the harm was inflicted intentionally and without justification or excuse." *Ibid.* (citation omitted). Third, "the complaint must allege facts leading to the conclusion that the interference caused the loss of the prospective gain. A plaintiff must show that 'if there had been no interference[,] there was a reasonable probability that the victim of the interference would have received the anticipated economic benefits.' " *Ibid.* (citations omitted). Fourth, "the complaint must allege that the injury caused damage." *Id.* at 752, 563 *A.*2d 31.

▮▮▮ In this case, the critical inquiry is whether Merriam's interference was "without justification or excuse," and thus malicious. *Id.* at 756, 563 *A.*2d 31. That inquiry must focus on the propriety of the defendant's actions in the *context* of the case presented. *Id.* at 757, 563 *A.*2d 31. Plaintiff bears the burden of proving the absence of justification. *Ibid.*

▮▮▮ We concluded in *Printing Mart* that although the *Restatement (Second) of Torts*, § 766B (1979), uses the term "improper" in place of "malice," "the *Restatement* test is similar to the 'malice' standard currently applied by New Jersey courts." *Printing Mart, supra,* 116 *N.J.* at 752, 563 *A.*2d 31. The *Restatement* prescribes a balancing test for determining whether an interference is improper. *Restatement (Second) of Torts* § 767B cmt. a,· § 767 (1979). It considers eight factors. *Id.* at § 767. In our view, the factors most pertinent to the "malice" standard and to this case are: (a) the nature of the actor's conduct, (b) the actor's motive, (d) the interests sought to be advanced by the actor, and

(e) the social interest in protecting the freedom of action of the actor and the contractual interests of the other.

■ The actor's interest is significant because it is usually economic and "[a]n interest of this type is important and will normally prevail over a similar interest of the other if the actor does not use wrongful means." *Id.* at cmt. f. Therefore, a threat to terminate ordinary business relations with an employer, even if intended to cause the discharge of an employee and even though undertaken with malice, is not actionable unless it is "for a reason not reasonably related to the protection of a legitimate business interest of the actor." *Smith v. Ford Motor Co.,* 289 *N.C.* 71, 221 *S.E.*2d 282, 296 (1976).

The record suggests that Merriam believed that his economic interests as a landlord were adversely affected by plaintiff's vote as an elected official for the parking ordinance. Moreover, the record indicates that at least two issues remained unresolved at the time of MacDougall's discharge: whether an expanded parking ban would cover the remainder of the street and whether the municipality would provide alternate parking for the businesses in Merriam's office building. (MacDougall himself stated that after the initial vote, "we were still trying to resolve some of this.") On remand, the analysis should be directed to whether there was a sufficiently reasonable relationship between Merriam's conduct and his legitimate business interests.

## V

The judgment of the Appellate Division is reversed. The case is remanded for further proceedings consistent with this opinion.

Justices GARIBALDI and COLEMAN join in Justice HANDLER's opinion.

Justice O'HERN filed a separate concurring opinion.

Chief Justice WILENTZ filed a separate dissenting opinion in which Justice STEIN joins.

Justices POLLOCK and STEIN filed separate dissenting opinions.

O'HERN, J., concurring.

I join in the opinion and judgment of the Court announced by Justice Handler. I write separately to suggest that the differences between the majority and dissent may be more rhetorical than real. My own views are perhaps oversimplified but help me to put the case in focus.

This case is not just about political bribery, although that is a legitimate concern. It is also about the rights of employers to be disassociated from the political views of their employees. I have no sense of the flavor of the controversy over this parking ordinance in the Borough of Chester. However, we are all familiar with similar heated controversies in our towns. Some citizens may consider the refusal to build an addition to a high school the most destructive decision imaginable. Others may consider the construction of the high school a serious economic loss to them. Some citizens may consider that a vote on a high-rise building may destroy the character of the community and may affect their economic well being while others may not.

Those issues can become terribly controversial. The citizens in the community may divide into separate camps. One of the legal questions that we must consider is whether an elected official may hold the boss bound to the official's political views.

The dissent faults the majority for creating "an ill-defined remedy" tied to a specific conflict of interest. *Post* at 434, 677 A.2d at 189. But the dissent's remedy is also limited to "the hidden fix attempted by someone specially economically impacted by a vote and undertaken through a bribe or a threat or a retaliatory discharge." *Post* at 434, 677 A.2d at 188. We can all agree that an employee of an employer "specially economically impacted by a vote" is thereby disqualified to vote. *See Griggs v. Borough of Princeton*, 33 *N.J.* 207, 220–21, 162 A.2d 862 (1960). Hence, the two remedies are conceptually alike.

A broader holding would undermine, not reinforce, democratic ideals. Ours is the oldest continuous form of democracy. It has

survived thus far in New Jersey without a tort action for the wrongful discharge of a public officer for reasons related to the exercise of official duties. We must carefully mold any remedy that we fashion on this subject.

I believe that everyone's politics are personal. When a public official solemnly swears, as the dissent emphasizes, "faithfully, impartially and justly [to] perform all the duties of ... [a] councilman," *post* at 434, 677 *A*.2d at 189, that public official has no right to expect that his or her employer must at every moment remain associated with the political views expressed in the performance of those duties when those views are calamitous to the employer's business. In a responsible democracy it is the public official who must choose between public office and his or her own private interest. I do not believe that we can require every citizen-employer to be bound to the politics of an employee.

In the long run, I believe that any more sweeping restraint on the right of employers to disassociate themselves from the politics of their employees would damage the effort to encourage citizens to participate in a democracy. Employers will necessarily hesitate to employ elected officials for fear that fair-minded employment decisions may become the subject of a lawsuit. I thus agree with the majority that a test that first inquires whether there has been a violation of the clear mandate of public policy expressed through our conflict-of-interest laws best balances the public interest in the free exercise of political rights by employers and employees.

WILENTZ, C.J., dissenting.

There is no clearer general mandate of public policy than the duty of public officials to vote honestly in accordance with their conscience and with due regard for the interests of those they represent. And there is no clearer specific mandate of public policy than the prohibition against bribes and threats that would corrupt their honesty and their vote. In a democracy governed by the vote of elected officials, it is understood and accepted that those officials must vote for what they believe is in the best

interest of society, and not for their own or another's economic interest. The Court today perceptively recognizes the connection between the facts of this case and the conflict-of-interest laws. Ultimately, however its reasoning and result disserve both the general mandate and the specific mandate for it accords undue weight to the interest of employers. Its opinion will likely permit an employer to discharge an at-will employee who, in fulfilling his duty as a public servant, fails (or refuses) to vote in the economic interest of his employer or one of his employer's customers. In the process, the Court has created a complex doctrinal maze and has provided insufficient guidance or standards to help trial courts and litigants navigate through it.

This is not a case about an unfortunate employer being dragged involuntarily into a swirling political controversy by one of its employees, the president of the local town council. It is not about an employer risking a massive loss of customers because of that person's unpopularity arising from his vote on an ordinance of intense, community-wide interest. It is not about that employer's right to fire that employee to save its business.

This is a case about an attempted corrupt fix that did not work. It is about a businessman who opposed an ordinance of extremely limited scope that uniquely affected and hurt his business. It is a case about a businessman who discovered what he undoubtedly thought was his good fortune—one of the employees of a company over which he had some influence happened to be the president of the local town council. It appears that the businessman used his leverage over that company first by getting it to "suggest" that the council president kill the ordinance and then, after the ordinance was passed, by getting it to "suggest" again that he reverse his vote. There is no suggestion that the employer resisted that leverage and it is beyond dispute that it participated in the businessman's attempted fix. Because the council president did not budge, however, the businessman insisted that he be fired, and the employer fired him. In short, the council president was fired from his private job because he refused to participate in the fix.

There is nothing complex about this case except the majority's treatment of it. It is a simple case, as is the principle that should govern it: in New Jersey an employer should not be able to fire an employee because, as a public official, that employee refuses to participate in a corrupt fix.

Although I agree that summary judgment was improperly granted in this case and that the case must therefore be remanded for further proceedings, I simply cannot subscribe to the Court's articulation of the law in this area and consequently cannot join in the majority's opinion. Accordingly, I respectfully dissent.

## I

MacDougall was a member and president of the governing body of the Borough of Chester and was a sales associate at Weichert Realty. He voted in favor of a parking ordinance that he believed was in the best interest of his constituents. The vote, however, was against the economic interest of Merriam, one of Weichert's customers. Merriam then pressured Weichert to fire MacDougall, which it did. MacDougall did not receive a bribe for a good vote; instead, he was fired for a bad vote.

I suspect the majority has been influenced by its sense that Weichert may not have threatened MacDougall until the very end and that its role in this matter was passive, simply responding to the pressure of an important customer. Experience tells us, however, that the facts may not be what the bare record suggests. It is not unlikely that Merriam contacted Weichert, and that the Weichert employee who called MacDougall did so because she had been asked to call, either by Weichert, by Merriam, or by both. Despite the apparent (or alleged) absence of threats prior to MacDougall's initial vote, after that vote he *was* pressured by Weichert. Although not disclosing who was interested, Weichert let MacDougall know that it had a "party" that was "very disturbed about the parking ordinance." It seems likely that Weichert was covertly telling MacDougall that it was important to Weichert that he change his vote. I suspect that MacDougall

knew from the outset that Merriam was the "disturbed" party, although MacDougall steadfastly contends he did not know or did not remember or was not sure of the "disturbed" party's identity. *See ante* at 387, 677 *A.*2d at 165. Sometimes the wish is the father of the thought, however, and MacDougall may have wished that he had voted without any such knowledge for he may have thought that he should have recused himself. I suspect that the facts, were they fully known, conform to the classic attempted fix.

Those foregoing speculations about the facts may be no more than that and I do not believe they are critical. The possibility that the facts are as I have suggested, however, may make it easier to consider the public policies involved, and the protections that honest public officials need. Either way, I believe that the damage to public policy is the same and the remedy for that damage should be the same. Assuming MacDougall is found to have been an employee of Weichert, he should have a cause of action against both Weichert and Merriam—against Weichert for wrongful discharge, against Merriam for causing it, and a further cause of action against Merriam for the tort of interfering with MacDougall's prospective economic advantage in remaining Weichert's employee.

Vindication of that public policy is too important to allow it to be defeated by the competing economic interest of the employer. Employers throughout this state must know in no uncertain terms that no matter how great the pressure of a customer with an economic interest in a vote, they may not fire an employee-public servant because he votes the wrong way, and they may not threaten to do so. The consequences of allowing a retaliatory discharge because of the public servant's vote are clear. Once the freedom of the employer to do so is understood by employees who happen to be public servants, they will be well-advised and will undoubtedly seek to determine whether matters before them are ones that might affect their employers or their employers' customers and vote accordingly.

If on remand MacDougall is deemed to be an employee for the purposes of the doctrine of *Pierce v. Ortho Pharmaceutical Corp.*, 84 *N.J.* 58, 417 *A.*2d 505 (1980), I would rule on this record as a matter of law that his discharge violated a clear mandate of public policy and as such was both tortious and a breach of contract. I would also rule as a matter of law that Merriam was a joint tortfeasor if, on remand, the facts support what the record before us strongly suggests—that Merriam threatened to terminate its relations with Weichert either for the purpose of causing or knowing that such threat was likely to cause MacDougall's discharge. Because I believe that the record establishes that Merriam acted intentionally and with malice, I would rule as a matter of law that Merriam tortiously interfered with MacDougall's reasonable expectation of future economic advantage, *i.e.*, his expectation of continuing to work for Weichert. I would instruct the trial court to rule as a matter of law on the employee/independent contractor issue based on the facts developed by the parties. That ruling would depend on whether, given the purposes of the *Pierce* doctrine, MacDougall's position did or did not, as a matter of public policy, warrant the same kind of protection given to employees-at-will.

## II

The threshold issue in this case is whether, for purposes of *Pierce*, MacDougall was an employee or an independent contractor.[4] Whether one is an employee or an independent contractor is a part legal and part factual question that may depend on the consequences of the answer. Put differently, the answer may be "employee" for the purposes of applying the *Pierce* doctrine but "independent contractor" if the question is whether the putative employer is vicariously liable for the putative employee's tort. Although the majority apparently recognizes that principle, *ante*

---

[4] As the following indicates, I disagree with Justice Pollock's conclusion that on this record, MacDougall, as a matter of law, is not covered by the *Pierce* doctrine.

at 388–389, 677 *A.*2d at 165–166, it fails to provide adequate guidance to the trial court for making the determination.

The majority's statement that *Pierce* does not apply to independent contractors is probably correct, but there is no need in this case to go that far. I believe that the trial court should consider those factors that led us in *Pierce* to modify the traditional doctrine of at-will employment. It may be that for *Pierce* purposes MacDougall should be regarded as an employee. The intuitive notion that would lead one to reject *Pierce* protection for independent contractors is that they do not need it—they presumably have various customers, and are therefore not as completely dependent on their employer as are at-will employees. There may be some "independent contractors," however, that in reality do business with only one company and are totally dependent on that company.

I would direct the trial court to analyze MacDougall's situation, and further, to analyze the situation of real estate agents working for firms like Weichert, for it seems to me that the rule should have generality. I believe that that would be a question of law requiring very little factfinding, but the issue has not been addressed by the briefs or in oral argument. Under these circumstances, it would be preferable to have a full-blown trial of the issue and let the trial court decide whether the matter can be disposed of by the court or requires a factual determination by the jury.

There are a number of factors that should be considered in determining whether MacDougall is an employee or an independent contractor. Those include: (1) whether MacDougall's services were available to anyone else (or could have been made available to others under his agreement with Weichert); (2) whether a substantial portion of his activities resulted from referrals from Weichert; (3) whether real estate agents in his position are economically vulnerable and can (but will not necessarily) suffer substantial loss from being discharged; and (4) whether invocation of the *Pierce* rule would unduly restrain Weichert's

legitimate rights. The factors that are traditionally considered in making that determination should also have substantial but not dispositive weight. Those are fairly described by the majority. *See ante* at 388–389, 677 A.2d at 165–166.

## III

Putting the employee versus independent contractor issue aside, I now turn to the central issue in this case—whether MacDougall has a cause of action against Weichert and/or Merriam. The majority's basic premise is that MacDougall may have a cause of action for wrongful discharge if it is found that Weichert and/or Merriam violated a clear mandate of public policy derived from our criminal statutes prohibiting threats and retaliation against public officials. The majority concludes that, although Weichert's conduct in this case was not a crime, those statutes provide a basis for finding a violation of a clear mandate if MacDougall can show that Weichert's (and/or Merriam's) actions were "based on interests or relationships" that "engender" a disqualifying conflict of interest. *Ante* at 402, 677 A.2d at 173.

That conclusion is at once confusing and overly limited. Although the majority declares that "the conflict-of-interest laws not only impose duties on public employees but they also constitute constraints on persons dealing with public employees," *ante* at 402, 677 A.2d at 173, the majority never clearly defines what those duties are. It merely says that at-will employee-public servants are "afford[ed] protection ... from threats or retaliation based on interests or relationships that would engender disqualifying conflicts under the laws governing conflicts of interest." *Ibid.* There is nothing in the various conflict-of-interest statutes or relevant case law that suggests that those statutes were intended to regulate the conduct of anyone other than the public officials themselves. Moreover, the very notion of "engendering" a conflict of interest is problematical. Either an employer's business relationships create a conflict of interest for an employee-public servant or they do not—the employer's conduct toward the em-

ployee does not generally affect the outcome at all. As we said in *Griggs v. Borough of Princeton*, 33 *N.J.* 207, 219, 162 *A.*2d 862 (1960), "[t]he question is whether there is a potential for conflict, not whether the public servant succumbs to the temptation or is even aware of it."

The majority apparently suffers from a fundamental misunderstanding of what created the potential conflict of interest in this case. It was not Weichert's ordering MacDougall to change his vote (if that is indeed what Weichert did), but rather the fact that MacDougall worked for Weichert and that one of Weichert's major customers had a direct economic interest in the parking ordinance. Moreover, by relying on the conflict-of-interest laws, the majority unwisely focuses its attention on the vague "wrong" suffered by *MacDougall* as a result of the possible conflict of interest and Weichert's (or Merriam's) actions. The focus should instead be on the very real and definable wrong the *public* suffers when a private interest uses its economic power and influence to corruptly fix (or attempt to corruptly fix) the vote of a public official. After all, *Pierce* was designed to serve clear mandates of *public* policy. The majority loses sight of the forest for the trees, and in so doing, disserves the public's overriding interest in honest government.

What is most confounding to me, however, is why the majority so adamantly insists on making its decision turn on a direct application of the conflict-of-interest laws. Although the majority acknowledges that "[s]ources of public policy include the United States and New Jersey Constitutions; federal and state laws and administrative rules, regulations, and decisions; the common law and specific judicial decisions; and in certain cases, professional codes of ethics," *ante* at 391, 677 *A.*2d at 167, it never attempts to identify other sources that may be relevant to this case. Moreover, the majority fails to recognize that the possibility that Weichert and MacDougall did not violate the conflict-of-interest laws or the criminal code does not mean that the discharge did not violate a clear mandate of public policy.

Had the majority undertaken to look to other sources, it would have found that there are many, many sources that, taken together, point to an overriding clear mandate of public policy against what happened in this case. What follows is a discussion of those other sources, which I believe demonstrates beyond question that there is a clear mandate of public policy against the attempted corrupt fix of a public official's vote—a simple principle that the majority apparently does not endorse.

## A.

As does the majority, I begin the discussion of the various sources with the sections of our criminal code that prohibit threats and retaliation against public officials, *N.J.S.A.* 2C:27–3a and *N.J.S.A.* 2C:27–5. The former provides that a person commits a criminal offense "if he directly or indirectly . . . [t]hreatens unlawful harm to any person with purpose to influence a decision, opinion, recommendation, vote or exercise of discretion of a public servant. . . ." The latter provides that a person commits a criminal offense "if he harms another by any unlawful act with purpose to retaliate for or on account of the service of another as a public servant."

The majority concludes that those sections do not criminalize what Weichert and Merriam did in this case. *See ante* at 399–400, 677 A.2d at 171–172. Whether this is correct or not is not particularly relevant here. Certainly, the fact that a clear mandate of public policy is not incorporated in legislation making its violation a crime does not render it any less a clear mandate of public policy. Many cases of this nature, indeed most, involve a clear mandate of public policy the violation of which is not criminalized. *See, e.g., Velantzas v. Colgate–Palmolive Co.,* 109 *N.J.* 189, 192, 536 A.2d 237 (1988) (observing that discharge of employee for requesting information relevant to suspected gender-based employment discrimination would be actionable under *Pierce*); *Lally v. Copygraphics,* 85 *N.J.* 668, 670–71, 428 A.2d 1317 (1981) (recognizing cause of action under *Pierce* for retaliato-

ry firing of employee who filed worker's compensation action even though specific statutory remedy was available). The Legislature's decision not to criminalize a violation of public policy, especially when that public policy is otherwise clear beyond debate—as this one is—should not be taken either as permission to violate it, approval of its violation, or as in any way diminishing its clarity. Indeed, properly understood, I believe that the statutes on which MacDougall primarily relies by themselves constitute a clear mandate of public policy. There may have been many reasons for not criminalizing violations of that mandate that leave its clear declaration of public policy unaffected.

That point is well-illustrated by the history of the drafting of the relevant sections of the Model Penal Code. The principle issue facing the American Law Institute was what types of threats and retaliation should be criminalized. Two positions emerged. One favored making threats of "unlawful harm" criminal. The other advocated making all "corrupt" threats criminal. In the former case, the scope would be defined by reference to background law, with any conduct that constituted a crime or a tort considered "unlawful." *Model Penal Code* § 208:11 cmt. at 108 (Tentative Draft No. 8, 1958) [hereinafter *Tentative Draft*]; *see also Model Penal Code* § 240.2 part II commentary at 52 (1980) [hereinafter *MPC*]. The latter formulation would have left the definition of "corrupt" to the courts. *MPC* § 240.2 part II commentary at 51.

Although the ALI ultimately chose not to adopt the "corruptly" standard, *see MPC* § 240.2 part II commentary at 51 (1980), that was solely the result of the Institute's general inability to define precisely what pressures on a politician should not be criminalized. *See ibid.* ("These distinctions are too subtle for resolution by the blunt instrument of *criminal* prosecution. . . . [I]t would be intolerable to subject all such decisions to review under the *penal* law.") (emphases added); *id.* at 52 ("The fact that the content of this body of law is specific and ascertainable is what commends use of 'unlawful' rather than 'corrupt' to designate the types of threat that are forbidden," *i.e.*, criminalized.). It did not evince

any approval of the use of discharge threats to sway the votes of public officials. Indeed, one of the reasons the ALI came close to adopting the "corruptly" rubric was to prevent that type of threat. *See Tentative Draft* § 208:11 cmt. at 108–09.

The same general considerations led the ALI to adopt the "harm by any unlawful act" standard in the retaliation section. *See Tentative Draft* § 208:13 cmt. at 110; 35 *A.L.I. Proc.* 363–64 (1958). The main reporter for that section recognized that in confining retaliation to "unlawful acts," "[t]here comes a point at which we relax our *Penal Code surveillance* of this matter...." 35 *A.L.I. Proc.* 363 (1958) (emphasis added). That recognition lends further credence to my contention that the ALI in no way intended to immunize retaliatory firings from civil liability.

The ALI elected clarity over completeness—a choice it thought necessary in the unique context of the criminal justice system. In the process, the ALI created "an obvious gap," obvious even to the drafters. *See Tentative Draft* § 208:11 cmt. at 108 ("restricting [the threat section] to 'unlawful' acts would leave obvious gaps in its coverage"). I suggest that that is a huge gap, possibly allowing corrupting influences of the type involved in this case to go unpunished by our criminal justice system.

Although I sympathize with the frustration that the drafters of the Model Penal Code experienced in defining the scope of prohibited conduct, I do not believe that our Legislature intended to permit conduct that, for all intents and purposes, is the same as a bribe. Both in terms of the facts, the law, the questions of proof, and our mores, that type of economic threat, made to influence a public servant's vote, is totally indistinguishable from a bribe, a form of conduct that has always been criminal.

## B.

I now turn to *N.J.S.A.* 2C:27–2, the section of our criminal code that prohibits bribery. In providing a clear mandate of public policy against bribes (*i.e.,* economic reward for a vote), that section has, in my judgment, the same effect for their mirror image—

threats of economic harm. That they are not identical is clear, but equally clear is the fact that they do not differ in those characteristics that form the basis of the clear mandate of public policy. Their identity is so persuasive in that respect that ordinarily its mere mention would suffice. However, given the majority's disagreement here, *see ante* at 399–400, 677 *A*.2d at 171–172, more is needed.

I believe that the kind of threats against which the bribery section provides a clear mandate of public policy is limited to conduct that is equivalent to bribery in its core form: someone, or some entity, economically interested in a public official's vote, offers and/or pays money, or gives something of pecuniary value, to a public official to control his vote. The clear mandate of public policy against such bribes is also a clear mandate of public policy condemning conduct that is in all respects its equivalent: someone, or some entity, economically interested in a vote, threatens to inflict economic harm on a public servant to control his vote. The fundamental identity is that both involve the same potential for corruption through economic inducement, whether reward or punishment. There is no difference in substance and should be none in treatment between an economically-interested employer who promises his employee-public servant a promotion or pay raise to influence his vote [5] and one who threatens a demotion or pay cut.

Public policy dictates that result as well. If, as I contend, both core bribery and core threats violate a clear mandate of public policy, the effect on all employees would be identical: they would be given some assurance that the law supports their willingness to risk discharge. All employee-public servants in the state would be less corruptible and all employers would be less likely to attempt corruption. If a threat followed by the firing of an employee is *not* clearly remediable, although a bribe is, employers would be well-advised to use the threat.

---

[5] There is no question that that would constitute a bribe. *See Tentative Draft* § 208:10 cmt. 3 at 104 (1958) (including among examples of bribes corporate employee who sits in state legislature being offered promotion or raise in return for vote on particular bill).

We have hinted at the equivalence of bribes and threats before. Although we held in *State v. Scirrotto*, 115 *N.J.* 38, 48, 556 *A.*2d 1195 (1989), that the threat and bribery sections were designed to define two different crimes and that the same circumstantial evidence cannot be used to prove the commission of both, we nevertheless noted the essential similarity of those "two generically-distinct categories of conduct" in that both "seek to achieve the corruption of public officials." *Id.* at 48, 556 *A.*2d 1195. We referred, apparently with approval, to the following comment in the *New Jersey Criminal Justice Quarterly:* "[*N.J.S.A.*] 2C:27–3 [ (the threat section) ] is, in effect, a variation of the bribery prohibition. Its purpose is to prevent persons from subjecting public servants to undue influence by reason of threatened harm, as opposed to promised benefits." *Analysis of the Procedural and Sentencing Provisions of the New Jersey Penal Code and a Review of the Major Substantive Offenses,* 6 *Crim. Just. Q.* 124, 156 (1978), *quoted in Scirrotto, supra,* 115 *N.J.* at 44 n. 4, 556 *A.*2d 1195.

## C.

Sources other than the criminal statutes discussed above strongly support the conclusion that a clear mandate of public policy was violated in this case. The Legislature has enacted an elaborate scheme of ethics requirements pertaining to local government, *see N.J.S.A.* 40A:9–22.1 to –22.25 (Local Government Ethics Law); local school officials, *see N.J.S.A.* 18A:12–21 to –34 (School Ethics Act); and state officials, *see N.J.S.A.* 52:13D–12 to –27 (New Jersey Conflicts of Interest Law). Those statutes have a common theme and objective: to prevent or guard against, or at least reveal, the potential corruption of public officials at all levels, whether legislative or administrative, by virtue of some private economic interest. *See, e.g., N.J.S.A.* 40A:9–22.2e; *N.J.S.A.* 18A:12–24; *N.J.S.A.* 52:13D–23e. That interest may be the official's own economic interest, the economic interest of those with whom they have some connection, or the economic interest of a

potential employer. The objective is clear: public officials are supposed to vote in accordance with their conscience for the good of those they serve, completely uninfluenced by any private economic interest, including their own. As we said in *Driscoll v. Burlington–Bristol Bridge Co.*, 8 *N.J.* 433, 474, 86 *A.*2d 201, *cert. denied*, 344 *U.S.* 838, 73 *S.Ct.* 25, 97 *L.Ed.* 652 (1952), "[a]s fiduciaries and trustees of the public weal [public officials] are under an inescapable obligation to serve the public with the highest fidelity."

The potential for extraneous influence on public officials, even apart from money, has spawned restrictions prohibiting former officials from having certain dealings with the government. *N.J.S.A.* 40A:9–22.5b. Former state officials are prohibited from representing or appearing on behalf of anyone on any issue with which the state official was directly involved in during the course of his office. *N.J.S.A.* 52:13D–17; *see also N.J.S.A.* 5:12–60. Local governmental bodies are prohibited from awarding former officials contracts that were not publicly bid, from permitting former officials to represent anyone before them, or from hiring former officials for employment except under certain specific circumstances. *N.J.S.A.* 40A:9–22.5b(1) to (3). Moreover, local government officials are prohibited from undertaking any employment "which might reasonably be expected to prejudice [their] independence of judgment in the exercise of [their] official duties." *N.J.S.A.* 40A:9–22.5(e). One of the concerns that those restrictions seek to address is the possibility of former officials using their presumed influence with their former colleagues to sway their votes. That concern is considerably heightened if the former official has an economic interest in that vote.

The majority relies on the conflict-of-interest laws and cases interpreting them as the sole source for the clear mandate of public policy in this case. *Ante* at 401–403, 677 *A.*2d 172–173. Although I stress again my fundamental disagreement with the majority's holding that, to prevail under *Pierce*, MacDougall must somehow show that Weichert's actions violated those laws, those

laws do lend further support to the contention that MacDougall's discharge violated a clear mandate of public policy. Indeed, our cases require public officials not to participate in governmental matters where they have a conflict of interest. *See, e.g., Van Itallie v. Borough of Franklin Lakes*, 28 *N.J.* 258, 267–68, 146 *A.*2d 111 (1958); *Landau v. Township of Teaneck*, 231 *N.J.Super.* 586, 594, 555 *A.*2d 1195 (Law Div.1989).[6] Courts have uniformly held that disqualification is mandated when the employee-public servant's employer has a direct, *e.g., Griggs v. Borough of Princeton*, 33 *N.J.* 207, 219–22, 162 *A.*2d 862 (1960); *Sokolinski v. Woodbridge Township Mun. Council*, 192 *N.J.Super.* 101, 102–04, 469 *A.*2d 96 (App.Div.1983); *Aldom v. Borough of Roseland*, 42 *N.J.Super.* 495, 507, 127 *A.*2d 190 (App.Div.1956), or in certain instances, an indirect, *e.g., In re Tuxedo Conservation and Taxpayers Assoc.*, 69 *A.D.*2d 320, 418 *N.Y.S.*2d 638, 642 (1979), financial stake in the outcome.[7]

---

[6] I do not believe that recusal is an adequate answer to the problem posed by this case. Its fundamental deficiency is that it typically is the equivalent of a "no" vote (and never the equivalent of a "yes" vote). This case illustrates the point. If MacDougall had recused himself, the vote would have been 2–2 and the parking ordinance would have been defeated. Although recusal may eliminate the *appearance* of corruption, it does not serve the public interest in the same way that having uncorrupted public officials would.

If recusal were accepted as the sole "remedy" in cases of this nature, the cost of the remedy would be borne solely by the honest public official. The would-be corruptors would be free from liability, as would the public official who yields to the pressure. Whether recusal was mandated in the instant case or not, it provides no substitute for a rule that protects the employee-public servant who refuses to yield to his employer's corrupting pressure.

[7] In *Tuxedo*, a town board member was also a vice-president of an advertising agency that had, as one of its clients, the subsidiary of a company that would be directly affected by a particular ordinance. 418 *N.Y.S.*2d at 639. Although the member was aware that there was a potential conflict of interest, he refused to disqualify himself and cast the decisive vote on the issue. *Ibid.* The court annulled the ordinance, finding the council member had violated the spirit of New York's municipal conflict-of-interests law. *Id.* at 640. *Tuxedo* suggests that the fact that Weichert was only "indirectly" interested in the outcome of MacDougall's vote may be irrelevant.

Other statutes protect a similarly fundamental political right—the right to vote or not to vote. Those statutes make it a crime for an employer to threaten harm to induce an employee to vote or not to vote, or to inflict harm because of either. *See N.J.S.A.* 19:34–27; *N.J.S.A.* 18A:14–99. Indeed, *any* person who intimidates anyone to vote or not to vote or interferes with anyone's right to vote, in almost any way, or compels anyone to vote or not to vote, is guilty of a crime. *See N.J.S.A.* 19:34–28 to –30; *N.J.S.A.* 18A:14–100 to –101. Although those statutes cover elections only, the vote of a board member or council member, who may have one of the total of five votes on the entire board, is at least as important as a vote at a general election.

Even more closely analogous are the sections that prohibit employers from enclosing in their employees' pay envelopes "threats, expressed or implied, intended . . . to influence the political opinions or actions of [their] employees." *N.J.S.A.* 19:34–30 (applying to elections in general); *see also N.J.S.A.* 18A:14–102 (applying to school board elections). Violation of either of those sections is a crime. *N.J.S.A.* 19:34–31; *N.J.S.A.* 18A:14–104. Presumably, those statutes were designed to prevent employers from using threats to influence their employees' votes, but the statutes are broader, prohibiting threats, including implied threats, aimed at influencing *any* political votes of an employee, the language seeming to encompass voting as a legislator.

The Conscientious Employee Protection Act ("CEPA"), *N.J.S.A.* 34:19–1 to –8, provides further support for finding a violation of a clear mandate of public policy in this case in that it undermines the majority's position that—but for the conflict-of-interest laws—MacDougall would not have a civil remedy because his discharge did not constitute an "unlawful act." Like *Pierce,* CEPA forbids retaliatory discharges that are incompatible with a clear mandate

of public policy.[8]  *N.J.S.A.* 34:19–3c(3).  Under CEPA, discharge is *in itself* enough:  the employer need not threaten at all.  Furthermore, the statute protects an employee who "blows the whistle" on another employer with whom his employer has a business relationship.  *N.J.S.A.* 34:19–3(a).  In enacting that provision, the Legislature recognized that the public policy served by CEPA would be undermined if the employer could retaliate against the employee for exposing the other employer's objectionable conduct.

Federal law also provides a clear mandate of public policy against what happened in this case.  *See D'Agostino v. Johnson & Johnson, Inc.*, 133 *N.J.* 516, 528, 531–35, 628 *A.2d* 305 (1993) (holding that federal law can provide source of state public policy for determining whether discharge of employee violated clear mandate of public policy).  Relevant here is 18 *U.S.C.A.* § 372, which makes it a criminal offense to

> conspire to prevent, by force, intimidation, or threat, any person from accepting or holding any office, trust, or place of confidence under the United States, or from discharging any duties thereof, ... or to injure him in his person or property on account of his lawful discharge of the duties of his office....
>
> [18 *U.S.C.A.* § 372.]

Section 372 is a clear expression of the public policy condemning, as contrary to the public interest, threats against public officers in the performance of their duties.[9]

---

[8] MacDougall chose to bring his action under *Pierce*, and in so doing, foreclosed any potential cause of action under CEPA.  *See N.J.S.A.* 34:19–8; *Young v. Schering Corp.*, 275 *N.J.Super.* 221, 238–39, 645 *A.2d* 1238 (App.Div.1994).

[9] The Hatch Act, 5 *U.S.C.A.* §§ 1501–1508, 7321–7326, lends further support to my position.  Although the Act places some limits on federal employees in their political activities, *see* 5 *U.S.C.A.* § 7323–7324, it explicitly recognizes that federal employees "should be encouraged to exercise fully, freely, *and without fear of penalty or reprisal,* and to the extent not expressly prohibited by law, their right to participate or to refrain from participating in the political processes of the Nation," 5 *U.S.C.A.* § 7321 (emphasis added).  The underlying purpose of the Act is to prevent the government (*i.e.,* the employer) from using its economic leverage over its employees to induce them to support the government's political agenda.  *See id.*  The same concerns apply to private employers (although I note that the Hatch Act expressly prohibits federal employees from running for

The United States Constitution also provides a basis for supporting the finding of a clear mandate of public policy in this case.[10] In *Rutan v. Republican Party*, 497 *U.S.* 62, 72, 110 *S.Ct.* 2729, 2735, 111 *L. Ed.*2d 52, 66 (1990), the Supreme Court held that public employees who are not at a policy-making level or entrusted with confidential duties are protected by the First Amendment's guarantees of freedom of speech and of association from being fired because of their political party affiliation. Surely the patronage prohibited by *Rutan* poses a much greater threat to political freedom than what I hope are the less frequent occurrences of corruption of public officials in their vote. Although the aggregate harm may be worse in the former case, the appearance of corruption is greater in the latter.

Finally, among the sources supporting the finding of a clear mandate of public policy are the many statutes passed in the past two decades to rid our political system of the influence of money. *See, e.g.*, 2 *U.S.C.A.* §§ 431–455 (requiring disclosure of source of federal campaign funds and setting limits on amount that persons or groups may contribute); *N.J.S.A.* 19:44A–1 to –47 (regulating campaign contributions and expenditures in state elections); *see generally Buckley v. Valeo*, 424 *U.S.* 1, 96 *S.Ct.* 612, 46 *L.Ed.*2d 659 (1976) (upholding federal campaign contribution limits but declaring unconstitutional limits on contributions to own campaign). Those statutes were enacted to limit, control, disclose and in some cases, prohibit political contributions. They provide yet another clear expression of the public policy against the use of money to attempt to corrupt the votes of public officials.

---

partisan political office, *see* 5 *U.S.C.A.* § 7323(a)(3), ruling out the precise scenario encountered in the instant case).

10 I also note the potential of First Amendment values reflected in the New Jersey Constitution as a potential source of a clear mandate of public policy in this case. *Cf. Novosel v. Nationwide Ins. Co.*, 721 *F.*2d 894, 898–901 & n. 6 (3d Cir.1983) (considering Pennsylvania Constitution's guarantee of "free communication of thoughts and opinions" as source of clear mandate of public policy).

## D.

Although there are no New Jersey decisions on point, the Oklahoma Supreme Court's decision in *Smith v. Farmers Cooperative Ass'n*, 825 *P*.2d 1323 (Okla.1992), lends still further support to my position. The *Smith* court concluded, on a motion for summary judgment, that the materials submitted on behalf of the plaintiff could lead a reasonable jury to conclude that a clerk at a farmer's co-op had been wrongfully discharged by his employer because he did not use his official position as mayor of a town to support a zoning variance sought for personal gain by one of the members of the board of directors of the co-op. *Smith, supra*, 825 *P*.2d at 1327. The director's role in *Smith* was apparently analogous to that of Merriam in the instant case and, apparently as here, the firing in *Smith* was pure retaliation. The court, stressing the need to narrow the grounds on which such firings would be prohibited, found that the "clear mandate of public policy" could be drawn solely from the statute defining the municipality's general zoning power, which specified it was to be used "[f]or the purpose of promoting health, safety, morals or the general welfare of the community." *Id.* at 1326. The court noted that

[a]n official who derives his authority from [the statute] is required to act in the public's best interest. The public policy exception to the employee-at-will doctrine applies when an employee is fired in retaliation for acting [in the public's best interest].... [I]f Smith were fired for performing an act consistent with public policy such as administering the town's zoning laws while acting in his capacity as mayor and a voting member of the town's board of trustees, he would have an actionable tort claim.

[*Ibid.*]

The distinction that the majority draws between administrative and legislative duties to distinguish *Smith* from the instant case, *ante* at 397–399 n. 2, 677 *A*.2d at 170–171 n. 2, is unpersuasive. That distinction is apparently based on the Model Penal Code, which divides administrative and judicial functions from legislative functions for the purpose of assessing criminal liability. *MPC* § 240.2(1)(a)-(b). The *Smith* opinion, however, never even refers to the Model Penal Code and never hints at that distinction.

The *Smith* court's decision served the clear mandate of public policy that public servants who vote in the interests of the public should not be fired because of the economic interest of their employer, or because of the economic interest of someone with whom the employer has a business relationship. It is directly analogous to the instant case.

## E.

There is one other theme in the majority's opinion with which I must take exception. In noting that "the interests of the employee, the employer, and the public" must be balanced before a court can find that a clear mandate of public policy has been violated by an employee's discharge, *ante* at 390, 677 A.2d at 167, the majority, perhaps unwittingly, lends further credence to what is, I believe, a common misstatement of the *Pierce* doctrine. The principle of balancing in wrongful discharge cases has sometimes been discussed as if it were the typical case-by-case evaluation by which Chancery Division courts assure that justice is done in every case. That is not the essence of *Pierce* and its progeny, however, and for good reason: clear mandates of public policy are designed to serve the public interest—they are general rules, and sometimes their application in a specific case may seem harsh or unwarranted. But if the clear mandate has been properly identified, the public interest will be best served if it is applied uniformly.

The balancing language in *Pierce* was meant to describe the general *process* that produced the *Pierce* rule itself as well as that which precedes the finding or rejection in the case at hand of a clear mandate of public policy, as distinguished from determining which interest outweighs the other in each case where the mandate is implicated:

In *recognizing* a cause of action to provide a remedy for employees who are wrongfully discharged, we must balance the interests of the employee, the employer, and the public. Employees have an interest in knowing they will not be discharged for exercising their legal rights. Employers have an interest in knowing they can run their businesses as they see fit as long as their conduct is

consistent with public policy. The public has an interest in employment stability and in discouraging frivolous lawsuits by dissatisfied employees.

[*Pierce, supra,* 84 *N.J.* at 71, 417 *A.*2d 505 (emphasis added).]

In *Fineman v. New Jersey Department of Human Services,* 272 *N.J.Super.* 606, 640 *A.*2d 1161 (App.Div.), *certif. denied,* 138 *N.J.* 267, 649 *A.*2d 1287 (1994), the Appellate Division set forth the following formulation of the role of balancing in cases of this nature: "[A] clear mandate of public policy must be one that on balance is beneficial to the public. Determining public policy is a matter of weighing competing interests. This often involves considering the competing interests of society, the employee and the employer." *Id.* at 619, 640 *A.*2d 1161 (citations and quotation marks omitted). I agree with that formulation. The interests involved are weighed not to determine the outcome of the case but to determine the *existence* of a clear mandate of public policy, one that "on balance" is beneficial to the public. Balancing the interests in a specific case is justified only to the extent it helps us determine what is in the public interest.[11]

The majority's treatment of this issue, *ante* at 390–391, 677 *A.*2d at 167, is an instructive example of how the concept of balancing of interests is often misapplied. The majority appears to weigh the employer's interest against the employee's, disregarding the public interest. It acts as if the public servant's duty to vote in his perception of the public interest is a private right of the public servant, rather than the public's right. It asks whether the employee's interest in remaining employed outweighs the employer's interest in "run[ning its] business[ ] as [it] see[s] fit," *ante* at 390, 677 *A.*2d at 167, without ever suggesting there may be a public interest involved—the clearly superior public interest in honest government.

---

[11] The Legislature followed that approach in CEPA. Nowhere is there any suggestion that the individual interest of employee and employer should be balanced to determine the outcome: the remedies of CEPA are triggered upon the occurrence of certain things that have nothing to do with the damage or benefit incurred by the employee or the employer by granting or withholding relief. *See Fineman, supra,* 272 *N.J.Super.* at 620, 640 *A.*2d 1161.

## F.

In mistakenly relying on the conflict-of-interest laws as the sole source of the clear mandate of public policy, in ignoring the numerous other potential sources, and in appearing to elevate the interest of the employer above the public interest, the majority has left public servants with little prospect for a remedy. In so doing, the majority has completely lost sight of what is a simple and unquestionable truth—what happened in this case was an attempted corrupt fix of MacDougall's vote, driven by the purely economic interests of Merriam and Weichert. As I said at the outset and have reiterated throughout, this firing, whether it resulted from or "engendered" a conflict of interest or not, violated the clearest mandate of public policy there is.

It is impossible to tell from the majority's opinion precisely what issues will be submitted to the jury, not only on the *Pierce* wrongful termination count, but also on the tortious interference with prospective economic advantage claim, and even on the issue of distinguishing an employee from an independent contractor. As difficult as our task is in determining what the majority means, that difficulty will pale in comparison with the difficulties facing trial courts and juries, for the majority fails to provide adequate guidance or standards.

The majority not only misses this opportunity to place the Court and the law on the side of those who will not permit the corrupting fix of public officials, but it clearly permits threats to fire, and firing, when an employee-public servant fails to vote the way his employer wants him to in the many money-driven situations that do not violate the conflict-of-interest laws. It gives employers room to believe they may be within their legal right to put in the fix: they just have to learn how to do it right, perhaps with a hint but not a threat.

## IV

In this section I discuss what I believe should be the law governing this case. Additional questions that may arise from the

specific facts of this case, which are in certain respects different from the typical "fix," are also addressed.

## A.

I believe that the law in this area should simply be that an employer may not fire an employee-public servant in retaliation for the employee casting a vote that was against the economic interests of either the employer or one of the employer's customers. The basis for that conclusion is my conviction that there is a clear mandate of public policy against such retaliatory discharges. That conviction is based primarily on the functional identity between threats and retaliation and a bribe when manifested in what I have termed its core form. Even without a threat, it is the mirror image of a bribe. I have confined the proposed rule to that mirror image. It would apply only when the threat and/or retaliation is based on the employer's economic interest, direct or (as here) indirect.[12] It would go no further than that.

The rule proposed in this dissent would continue to permit an employer to discharge an employee-public servant for reasons other than retaliation for his vote or for no reason at all. The proposed rule would not make the employee-public servant an

---

[12] The rule would cover other similar types of threats and retaliation, including where there are variations in the nature of the demand made upon the employee and of the economic interest of the employer. The former include where the employer fires the employee-public servant for his mere refusal to vote in the employer's economic interest and where the employer demands the employee recuse himself and the employee refuses. The latter include where the employer's direct economic interest is unrelated to its business, where the employer's family or friends have a direct economic interest, or where the employer's business associates (not necessarily customers) have a direct economic interest. There are other possible variations that would fit within the core situation covered by the proposed rule. One such scenario is where the customer has not said anything to the employer, but the employer, aware of the *risk* that its customer will take his business elsewhere as a result of the vote, threatens to discharge (or actually does discharge) the employee-public servant. The employee should still be protected from discharge in that scenario. The interests are no different and any other rule would make it too easy for the employer to escape liability by asserting that its customer never asked it to discharge the employee.

employee-for-life any more than is an employee protected by civil rights statutes, worker's compensation statutes, or the CEPA statute. Nor would this rule prevent the employer or customer (or anyone else) from attempting to persuade the employee-public servant to vote a certain way. Anything short of a threat would remain permissible.

Some consideration should be given to the rule's potential impact. I suspect that in a host of similar situations, the employer who threatens to discharge, and/or discharges an employee-public servant because of his vote, may not be liable under *Pierce*. That is not because I think the policy considerations would call for such a different outcome, but because there may not be a sufficiently *clear* mandate of public policy. Beside the specific question of whether a clear mandate of public policy exists, those considerations may implicate countervailing public policies or even constitutional issues. We have not heard argument, or indeed given our full consideration, to the question of whether the aforementioned sources provide a clear mandate of public policy in the various other contexts that I mention below. I note them simply to describe the scope of the proposed rule and the considerations that, were it adopted, might or might not lead to similar conclusions in other related contexts.

The rule would not necessarily apply where the pressure on the employee-public servant to vote a certain way was purely political. Numerous individuals, groups, party leaders, and others, may have a political interest in the vote, whether in the form of strengthening the political party, improving its prospect in a forthcoming election, or similar political interests. The employer itself may have such an interest. The interest may be selfish, altruistic, wholesome, or otherwise, but if it is purely a political interest, and the employer makes the threat for that reason, the proposed rule, narrowly confined as it is in this dissent, would certainly not apply. I express no opinion on whether there is a clear mandate of public policy to cover that situation.

The rule also would not necessarily apply if the political pressure were combined with economic pressure, so long as the motivation of those applying it was not to serve their own direct or indirect economic interests. For example, a political party may persuade an employer's customers to exert economic pressure on the employer to cause it to threaten the employee-public servant. Similar pressure motivated by social issues likewise would not be covered by the proposed rule. As in the case of political pressure, I express no opinion on whether a clear mandate of public policy would cover that situation.

The prospect of picketing in front of the employer's place of business, threatening to withhold patronage, and other forms of economic pressure to effectuate the social goals of those protesting, should not be lightly dismissed. A rule prohibiting discharge might be totally ineffective: the protests and demonstrations would continue. Further, it might be unthinkable and perhaps unconstitutional to attempt to stop them. *Cf. Madsen v. Women's Health Ctr., Inc.*, 512 *U.S.* ——, ——, 114 *S.Ct.* 2516, 2530, 129 *L.Ed.*2d 593, 614–15 (1994) (holding unconstitutional order prohibiting anti-abortion protesters from demonstrating in front of family planning clinics); *Horizon Health Ctr. v. Felicissimo*, 135 *N.J.* 126, 638 *A.*2d 1260 (1994).

A more difficult situation would arise, however, if a group brought generalized economic pressure against an employer to force it to threaten and/or fire an employee-public servant for his vote. Obviously, that situation would have all of the ugliness of core bribery and its mirror image, but it also would have some of the aspects of social-issue pressure. That may make it impractical to remedy through a civil action. For example, a proposal to rezone a large tract of a community in a way that clearly would depress property values can provoke the same kind of pressures as are found in votes that generate political or social-issue pressures. The motivation of the reaction, if purely economic, is the functional equivalent of one entity applying (the same amount of) pressure in its own economic interest. The same would be true if

a large number of businesses, rather than individuals, brought the pressure. Obviously, that is not the mirror image of bribery.

The same conclusion pertains to the following hypothetical, which counsel referred to several times during argument. If an employer learns that the position or positions taken by its employee-public servant have or will cause numerous customers to take their business elsewhere, I do not believe there is any clear mandate of public policy preventing the employee's discharge. Such group action, often spontaneous, has none of the earmarks of the kind of corruption implicated in this case.

The foregoing illustrations demonstrate that the narrowly-targeted rule of this case is not aimed at the spontaneous reaction of numerous individuals, or even at group action. It is aimed at the "fix," the hidden fix attempted by someone specially economically impacted by a vote and undertaken through a bribe or a threat or a retaliatory discharge.

### B.

Unlike the usual factual setting of a corrupt fix, in this case there may not have been any threat made against MacDougall. Indeed, MacDougall contends that he did not know either that Weichert or Merriam had an interest in his vote. If this were true, then there would have been no danger of corruption in *this* vote. The facts however make it clear that *after* the vote, there was some pressure on MacDougall to change his vote. *Ante* at 409, 677 *A*.2d at 176. If it became known that MacDougall was fired in retaliation for his vote, every employee-public servant in the state would be forced to undertake their duties knowing that they could be next. Whether threatened or not, the discharge here poses the same danger to the clear mandate of public policy because it has the same potential to corrupt all employee-public servants in this state.

The various criminal statutes suggest the same conclusion: a bribe is illegal even if paid after the vote without a pre-vote promise. *See N.J.S.A.* 2C:27–2. Similarly, the general retaliation

statute does not require any prior bribe, offer, or threat before the vote in order to render the retaliation criminal. *See N.J.S.A.* 2C:27–5. From the employee's point of view the firing is unfair whether threatened or not, but if not threatened, it is not only unfair, it deprives the employee of the opportunity to plead his case with his employer or recuse himself.

A more troubling issue is Weichert's apparent lack of culpability. Concerns that the employer may have been "in the middle" through no fault of its own should not be ignored. Our cases have never held that such lack of culpability affects the outcome, however. To do so would be to deny the public the benefit of the clear mandate of public policy. The public invariably benefits from the honest vote of its public servants. It is the fundament of democratic government, and neither the culpable nor innocent employer has an interest sufficient to deprive the public of that benefit. If liability may ultimately fall on the employer, even though innocent, public policy mandates it.

The indirectness of Weichert's economic interest does not affect its culpability either. For purposes of the proposed rule, one cannot separate the economic interests of Weichert and its customer. They are intertwined. Even if Weichert is construed to be a victim of circumstances, it made a willing choice to participate in the fix in order to preserve its relationship with Merriam. Indeed, it actively participated by pressuring MacDougall to change his vote. Whether it was Weichert's desire to maintain its relationship with Merriam or its desire to cause MacDougall to vote contrary to his conscience is of no consequence. Hardly a bribe or a threat designed to influence a public servant's vote, or a retaliation because of that vote, has as its sole purpose influencing or corrupting the official. Its primary purpose, rather, is achieving some other goal through the means of the official's vote. Moreover, I believe that if my position were adopted it would be somewhat easier for employers to dissuade their customers from exerting such pressure in the first place.

V

Today's case involves only a small part of the problem of public corruption. I believe the Court has failed to do its part to remedy it. Instead of condemning the clear corruption of the "fix," it has constructed a convoluted doctrinal maze that will often serve only to deter and defeat legitimate claims. Although paying lip-service to the idea that a "vague, controversial, unsettled, and otherwise problematic public policy does not constitute a clear mandate," *ante* at 392, 677 *A.*2d at 167, the majority proceeds to articulate precisely that. Worse, the majority's holding fails to serve the public's need for honesty and integrity in government. I urge the Legislature to remedy it.

The majority presumably understands that few people who are public servants would stand firm if the price were retaliatory discharge from their jobs. My proposed rule would not prevent that type of corruption, nor would it always dissuade those with an economic interest from attempting to corrupt public officials through their employers, nor would it dissuade employers from doing so in their own (or their customer's) economic interest. What it would do is provide an employee-public servant with a weapon—the ability to tell his employer that it is the law of this state that he can and must vote his conscience, vote in favor of what he believes is in the public interest, and that he may not be discharged for doing so. The majority, by contrast, leaves such a public servant with an ill-defined remedy, available only if the employer's action violated conflict-of-interest laws in some as-yet unspecified way.

When MacDougall took office he was required to take the following oath: "I, John W. MacDougall, do solemnly swear (or affirm) that I will faithfully, impartially and justly perform all the duties of the office of Chester Borough councilman according to the best of my ability. So help me God." *See N.J.S.A.* 41:1–3; *State v. Penta,* 127 *N.J.Super.* 201, 204–05, 316 *A.*2d 733 (Law Div.1974).

I would reverse the decision below and remand the matter for further proceedings in accordance with this dissent.

Justice STEIN, joins in this dissent.

POLLOCK, J., dissenting.

The entire Court agrees that plaintiff, John W. MacDougall, may not maintain this action for wrongful discharge unless he was an employee of defendant Weichert Co. Realtors (Weichert). Both the Law Division and the Appellate Division ruled that MacDougall was not a Weichert employee. I agree and would affirm solely for that reason. Consequently, I need not reach the provocative issues that divide my colleagues.

I

Following his retirement, MacDougall became a real estate salesman. In 1984 Weichert hired him as a "Sales Associate" in its Chester Borough office. In accordance with *N.J.A.C.* 11:5–1.10, on March 5, 1984, he signed a standard Weichert agreement, which provided in relevant part:

1. The Broker agrees to make available to the Sales Associate materials, supplies and equipment, telephone service, secretarial assistance, sales assistance and advice, as well as all current listings of the Broker, except sales listings as the Broker for valid and usual business reasons may place exclusively in the temporary possession of some other Sales Associates. Such facilities are to be shared with other Sales Associates with whom the Broker has or may hereafter have an agreement.

\*     \*     \*     \*     \*     \*     \*     \*

5. The Broker shall not be liable to the Sales Associate for any expenses incurred by the Sales Associate, or for any of his/her acts, nor shall the Sales Associate be liable to the Broker for any expense of the operation of the Broker's business. The Sales Associate acknowledges that he/she is not an employee nor a partner, but a Sales Associate with an independent contractor status, with no rights of workmen's compensation, salary, pension, sick leave, sick pay or other attributes of an employee relationship.

According to the agreement, MacDougall was not an employee, but an independent contractor. The agreement provided that MacDougall was to pay his own license fees to the State of New

Jersey and his membership in trade associations, such as the Morris County Board of Realtors. Furthermore, under the agreement, Weichert provided all sales associates, including MacDougall, with "materials, supplies and equipment, telephone service, secretarial assistance, sales assistance and advice, as well as all current listings of the Broker...." Additionally, MacDougall was not entitled to "any rights of workmen's compensation, salary, pension, sick leave, sick pay, or other attributes of an employee relationship."

After the incident that gave rise to this action, MacDougall joined another real estate broker, Centennial. At Centennial, as at Weichert, MacDougall's compensation was based solely on commissions. MacDougall acknowledged in depositions that at Centennial he was an independent contractor.

The objective facts confirm that MacDougall was an independent contractor, not an employee of Weichert. Those facts reflect a typical relationship between a broker and a sales associate. Before receiving his real estate sales license, MacDougall attended, as required by *N.J.A.C.* 11:5–1.27, training classes at a Weichert "school." As a sales associate, MacDougall reported his sales activities to the manager of the Chester office. MacDougall, however, was not required to attend any mandatory sales meetings. Nor did Weichert impose on him any mandatory sales quotas. MacDougall was a salesman on commission.

He was entitled to a listing commission for any property he listed with Weichert and a sales commission on any property that he sold. If MacDougall both listed and sold a property, he would receive both commissions. Typically, his commission would be fifty percent of whatever fee Weichert received as either the listing or selling broker.

Although Weichert paid for some advertising that benefitted all sales associates, MacDougall recognized that his personal contacts were his primary source of referrals. Like real estate sales persons generally, he garnered clients through friends, personal acquaintances, and others in the community.

Weichert neither reimbursed MacDougall for out-of-pocket expenses nor withheld from MacDougall's commissions deductions for either state or federal taxes. As an independent contractor, MacDougall filed a Form 1099 with the Internal Revenue Service.

## II

In *Pierce v. Ortho Pharmaceutical Corp.*, 84 *N.J.* 58, 82, 417 *A.*2d 505 (1980), we modified the common-law doctrine of employment-at-will to provide an employee a cause of action for wrongful discharge when his or her firing violated a clear mandate of public policy. Thus, an essential element of plaintiff's case is proof that plaintiff was an employee. Both the majority, *ante* at 388, 677 *A.*2d at 166, and the dissent, *ante* at 411–12, 677 *A.*2d at 166, recognize that *Pierce* does not provide a cause of action for independent contractors. Thus, the threshold question is whether MacDougall was an employee or an independent contractor.

## A

Traditionally, this Court has adopted the test in the *Restatement (Second) of Agency* § 220 when determining whether a hired person is an employee or an independent contractor. *E.g., Carpet Remnant Warehouse, Inc. v. Dept. of Labor*, 125 *N.J.* 567, 579–80, 593 *A.*2d 1177 (1991); *Millison v. E.I. du Pont de Nemours & Co.*, 101 *N.J.* 161, 203, 501 *A.*2d 505 (1985) (Handler, J., concurring in part and dissenting).

*Restatement (Second) of Agency* § 220(1) defines an employee or "servant" as "a person employed to perform services in the affairs of another and who with respect to the physical conduct in the performance of the services is subject to the other's control or right to control."

*Restatement (Second) of Agency* § 220(2) provides:

(a) the extent of control which, by the agreement, the master may exercise over the details of the work;

(b) whether or not the one employed is engaged in a distinct occupation or business;

(c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision;

(d) the skill required in the particular occupation;

(e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work;

(f) the length of time for which the person is employed;

(g) the method of payment, whether by the time or by the job;

(h) whether or not the work is a part of the regular business of the employer;

(i) whether or not the parties believe they are creating the relation of master and servant; and

(j) whether the principal is or is not in business.

Similarly, the United States Supreme Court has written that "[i]n determining whether a hired party is an employee [or independent contractor] under the general common law of agency, we consider the hiring party's right to control the manner and means by which the product is accomplished." *Community For Creative Non–Violence v. Reid,* 490 *U.S.* 730, 751, 109 *S.Ct.* 2166, 2178, 104 *L.Ed.*2d 811, 831 (1989); *see also Nationwide Mutual Ins. Co. v. Darden,* 503 *U.S.* 318, 323, 112 *S.Ct.* 1344, 1348, 117 *L.Ed.*2d 581, 589 (1992). In applying this control test, courts consider all aspects of the relationship between the parties. *N.L.R.B. v. United Ins. Co. of America,* 390 *U.S.* 254, 258, 88 *S.Ct.* 988, 991, 19 *L.Ed.*2d 1083, 1087 (1968); *see also Pelliccioni v. Schuyler Packing Co.,* 140 *N.J.Super.* 190, 199, 356 *A.*2d 4 (App. Div.1976) (stating that court must consider all surrounding circumstances).

Although the sale of real estate is heavily regulated, neither the Legislature nor the New Jersey Real Estate Commission has addressed specifically the issue of the employment status of real estate salespersons. The New Jersey Unemployment and Temporary Disability Law, however, provides that real estate salespersons are not employees if they "are compensated wholly on a commission basis." *N.J.S.A.* 43:21–19(i)(7)(k). Similarly, federal employment tax law provides that "a qualified real estate agent ... shall not be treated as an employee." 26 *U.S.C.A.* § 3508(a)(1). The definition of a "qualified real estate agent"

includes a licensed real estate agent who is compensated on the basis of sales made rather than hours worked and who has contracted that he or she will not be treated as an employee for federal tax purposes. 26 *U.S.C.A.* § 3508(b)(1)(A), (B), and (C). Thus, for federal and New Jersey tax purposes, MacDougall was an independent contractor. I need not determine whether a different result might obtain under the Worker's Compensation Law, *N.J.S.A.* 34:15-1 to 15-128. *New Jersey Property–Liability Ins. Guar. v. State,* 195 *N.J.Super.* 4, 9, 477 *A.*2d 826 (App.Div. 1984). As Professor Larson states: "The basic purpose for which the definition [of employee] is used in compensation law is entirely different from the common-law purpose." A. Larson, *Workmen's Compensation Law* § 43.42, at 8–20 (1990).

## B

The precise issue whether a real estate salesperson is an employee or an independent contractor is one of first impression in this State. Cases from other jurisdictions, however, establish that a real-estate sales person such as MacDougall is an independent contractor. In a factually similar case, the New York Court of Appeals ruled that a real estate agent was an independent contractor, not an employee, under the New York unemployment compensation law. *In re Wilson Sullivan Co.,* 289 *N.Y.* 110, 44 *N.E.*2d 387 (1942). Despite the statute's use of the term "employee" to describe real estate agents, the court concluded that common-law principles dictated that a real estate agent was an independent contractor not an employee. 44 *N.E.*2d at 389–90. In reaching that conclusion, the Court reasoned the dispositive inquiry was whether the broker exercised "control over either the results produced by [the agent] or the means employed by the [agent] to achieve the results." *Id.* at 388.

Looking at the facts, the Court observed that the broker provided salespersons with office and desk space, telephone service, stationary, and office supplies. *Ibid.* Agents submitted to the broker a record of sales. *Ibid.*

The broker, however, did not require sales agents to submit regular reports, and agents had "no specific hours, no definite

routine to follow, nor calls to make during the day." *Ibid.* Agents signed contracts specifying that they were independent contractors and took instruction only from property owners. *Ibid.* Furthermore, agents were not covered by worker's compensation law, *id.* at 389, and could pursue other occupations. The Court affirmed the decision of the Appeal Board denying benefits to the agent, concluding "there [was] no substantial evidence upon which to sustain the finding of the Appeal Board." *Ibid.*

More recently, the United States District Court for the Southern District of New York granted summary judgment dismissing the complaint of a real estate agent against her broker. *Krijn v. Pogue Simone Real Estate Co.,* 752 *F.Supp.* 102 (S.D.N.Y.1990), *aff'd without opinion,* 930 *F.*2d 910 (1991). The complaint alleged that the broker had discharged the agent because of discrimination based on sex and national origin contrary to Title VII, 42 *U.S.C.A.* § 2000e to 2000e–17. Under both the common-law-control test and a "hybrid" test then used to determine claims for benefits under Title VII, the court found that the agent was an independent contractor.

Before reaching that result, the court parsed the relevant facts. It noted that the real estate firm neither withheld taxes nor provided benefits to its sales agents. *Id.* at 104. Although the broker expected the agents to work periodically, it did not require them to keep regular office hours. The court noted that "[even] if weekly meetings call[ed] for mandatory attendance, as Krijn avers, this assertion is not enough to withstand dismissal...." *Ibid.* Commissions from sales were paid directly to the broker, which provided office space, supplies, resources, guides, and listings. Still, the court found that such practices did not constitute control over the details of the work product of the sales agents. *Ibid.* The court also emphasized that the broker paid the agents solely on a commission basis, and that the agents were responsible for the costs of obtaining their real estate licenses and that the agents' time was "totally unstructured." *Id.* at 104–05. After weighing

these factors, the court found that the agent was an independent contractor and granted summary judgment for the broker.

One year after the *Krijn* decision, the United States Supreme Court construed the term "employee" in the Employment Retirement Income Security Act of 1974 (ERISA). The Court reasoned that when a statute does not define the term "employee," a court should use the common-law agency test when analyzing the employment relationship. *Darden, supra,* 503 *U.S.* at 322–23, 112 *S.Ct.* at 1348, 117 *L.Ed.*2d at 589. Thus, the Court decided that agency law principles should apply to resolving the issue whether someone is an employee or an independent contractor.

In *Stetka v. Hunt Real Estate Corp.,* 859 *F.Supp.* 661 (W.D.N.Y. 1994), the plaintiff-real estate agent brought a sexual-harassment suit under Title VII, claiming that she was an employee of defendant-real estate broker. The agent sought to prove that she was an employee of the defendant-real estate broker. The broker required the agent to serve "floor time" in the firm's office for two hours a week and to attend weekly sales meetings and house tours. *Id.* at 667. Furthermore, the broker provided sales agents with office space and supplies. *Ibid.* As described by the court, the record revealed:

Plaintiff scheduled her own hours, marketed her own listings, and was expected to develop her own business leads. Plaintiff was paid on a commission basis, and did not receive any commission until the property was sold. No taxes were deducted from Plaintiffs' [sic] gross commission payment, nor was Plaintiff covered by either Worker's Compensation or New York State unemployment insurance. Plaintiff received a Form 1099 at the end of the year indicating the gross amount of commissions earned at Hunt Real Estate which was used to complete her federal and state income tax returns, including the payment of any self-employment social security tax. Plaintiff also paid for her own licensing fees with New York State, and paid her own fee to obtain multiple listing services.

[*Ibid.*]

Based on those facts, the court concluded that the broker did not exercise "day-to-day" control over the agent "such as an employer would exercise over an employee." *Ibid.* Rather, the agent's time was unstructured. She developed her own clientele and "marketed herself as an independent agent." *Ibid.* The court, therefore,

ruled that the agent was an independent contractor. *Ibid.; see also Breen v. Hunt Real Estate Corp.,* 1994 WL 417017 (W.D.N.Y. 1994) (reaching same result as *Stetka* ).

Similarly, the Appellate Division of Massachusetts has ruled that a real estate agent was not an employee for purposes of a criminal statute that required employers to pay wages on a weekly basis. *Commonwealth v. Savage,* 31 *Mass.App.Ct.* 714, 583 *N.E.*2d 276 (1991). The agent made her own hours, maintained an office in her home, obtained and paid for her own license, was not reimbursed for travel or business expenses, received no base salary, was paid only on a commission basis without deduction for payroll taxes, filed a Form 1099, and received no fringe benefits. 583 *N.E.*2d at 278–79. The Appellate Division in Florida reached a similar result in ruling that an agent employed by a firm to sell time shares was not an employee for purposes of the Florida Unemployment Insurance Law. *F.L. Enterprises, Inc. v. Unemployment Appeals Comm'n,* 515 *So.*2d 1340 (1987). Finally, the United States bankruptcy courts also have held that real-estate sales agents compensated solely on commission were "independent contractors," not employees. Consequently, the agent's earnings were not exempt from the Florida Wage Tax. *In re Hanick,* 164 *B.R.* 165 (Bankr.M.D.Fla.1994); *In re Moriarty,* 27 *B.R.* 73 (Bankr.M.D.Fla.1983).

MacDougall's reliance on *Golden v. A.P. Orleans,* 681 *F.Supp.* 1100 (E.D.Pa.1988), is unpersuasive. In *Golden,* the broker required the real estate agent to submit weekly activity reports and to attend weekly meetings. The broker distributed periodic company directives regarding daily work activity, and the agent drew a weekly salary against her commissions. *Id.* at 1101. MacDougall alleges none of these facts.

### III

Weichert furnished MacDougall with office space and supplies. MacDougall reported his sales to an office manager and shared commissions with Weichert. In none of the decided cases did

these facts lead to the conclusion that the real estate agent was an employee. Here, moreover, MacDougall, who was not required to attend sales meetings, was even less restricted than the agents who were held to be independent contractors in *Krijn*, *Stetka*, and *Breen*. Nor does MacDougall's attendance at a Weichert training course compel a conclusion that he was an employee. *Breen*, *supra*, 1994 *W.L.* 417017 at *1 (sales agent who attended six-week in-house training program held to be independent contractor).

The record makes clear that Weichert did not exercise over MacDougall the control typical of a common-law employment relationship. MacDougall, moreover, signed a contract acknowledging that he was an independent contractor. He received only a commission, not a salary or a draw. Weichert neither provided employment benefits to MacDougall nor deducted withholding taxes from MacDougall's commissions. At the end of each year, MacDougall filed a Form 1099 with the Internal Revenue Service. Weichert did not require MacDougall to attend mandatory sales meetings or to satisfy sales quotas. MacDougall was responsible for developing his own clientele and did not receive reimbursement for expenses. Weichert's interest was solely in the end results of MacDougall's efforts: sales and listings leading to commissions. Weichert abstained from controlling how MacDougall reached those results. *See Errickson v. Schwiers Co.*, 108 *N.J.L.* 481, 483, 158 *A.* 482 (E. & A. 1931) (stating that "[t]he relation of master and servant exists whenever the employer retains the right to direct the manner in which the business shall be done, as well as the result to be accomplished, or in other words, not only what shall be done, but how it shall be done."). No remand is necessary to determine that MacDougall was an independent contractor.

## IV

Just seven months ago, this Court took a new stand on the grant of motions for summary judgment. *Rule* 4:46; *Brill v. Guardian Life. Ins. Co. of America*, 142 *N.J.* 520, 666 *A.*2d 146

(1995). We held that the motion judge should grant such motions unless the evidence, when viewed in the light most favorable to the non-moving party, sufficed to permit a rational factfinder to resolve the dispute in favor of the non-moving party. As the Court explained, "[t]he thrust of today's decision is to encourage trial courts not to refrain from granting summary judgment when the proper circumstances present themselves." *Id.* at 541, 666 *A.*2d 146. Underlying the decision was the Court's recognition of the increase in the filing of meritless cases and the need to avoid unnecessary litigation. *Id.* at 539, 666 *A.*2d 146.

Even under the more stringent standard of *Judson v. Peoples Bank & Trust Co.*, 17 *N.J.* 67, 110 *A.*2d 24 (1954), the Law Division and Appellate Division concluded that Weichert was entitled to a summary judgment dismissing the complaint. From my perspective, those courts reached the right result. It follows that I reach the same result under *Brill.* By reversing the grant of summary judgment for McDougall and remanding the matter to the Law Division for trial, the Court undermines the holding of *Brill* and subjects the parties to the expense of needless litigation. I would affirm.

STEIN, J., dissenting.

With four separate opinions, there is a good chance that the casual reader might have difficulty understanding what all the fuss is about. A fifth opinion might clarify things a bit.

MacDougall, a Chester councilman, voted in favor of an ordinance regulating parking in the town's business section. Weichert, his employer, fired him allegedly because Merriam, an important client, was unhappy with MacDougall's vote and apparently threatened to take his business elsewhere unless MacDougall was terminated. MacDougall sued Weichert and Merriam.

The majority of the Court is uncertain about whether MacDougall has a cause of action. They remand the case to the trial court, with instructions to that court to take testimony and determine whether "Weichert's conduct * * * (in firing MacDou-

gall) was based on * * * relationships that would constitute an unpermissible conflict of interest," (apparently directing the trial court to focus on whether MacDougall, had he known of those relationships when he voted, would have had a disqualifying conflict of interest.) If so, the majority presumably would recognize a cause of action. *Ante* at 403, 677 *A.*2d at 173. The logic of tying MacDougall's cause of action to the resolution of that hypothetical conflict-of-interest inquiry is elusive, but the majority insists on placing that hurdle in the path of MacDougall's claim.

The Chief Justice and I view the case in simpler terms. As we see it, MacDougall allegedly got fired for an honest vote because a client that was unhappy put pressure on his boss to get rid of him. Under those facts, we would hold that his discharge violates a clear mandate of public policy—the mandate that public officials can neither be bribed nor unreasonably pressured to influence their official action. We believe the Court should state emphatically and unequivocally that, assuming those facts are proved, MacDougall can recover damages from Weichert and Merriam. A New Jersey public official who casts an honest vote should not be subject to discharge by an employer seeking to appease a disgruntled customer.

This case raises no profound issues of social policy as might be presented by the case of a storekeeper whose clerk-councilman employee opposes a planned parenthood clinic that the storekeeper's customers favor. As the Chief Justice acknowledges, his views in this case do not imply that the clerk in that hypothetical case would have a cause of action if the storekeeper discharged him. *Ante* at 433, 677 *A.*2d at 188.

This appeal poses a stark choice for the Court, with troublesome implications if the question were to be presented in a different context. Those implications do not alter our responsibility to decide *this* case clearly and decisively. The Chief Justice has it exactly right, and I join his opinion.

O'HERN, J., concurs in result.

*For reversal and remandment*—Justices HANDLER, O'HERN, GARIBALDI and COLEMAN—4.

*For reversal/remandment on other grounds*—Chief Justice WILENTZ and Justice STEIN—2.

*For affirmance*—Justice POLLOCK—1.